IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
October 25, 2012 Session

## AUDIO VISUAL ARTISTRY v. STEPHEN TANZER

**Direct Appeal from the Chancery Court for Shelby County**
**No. CH-07-2275-3     Kenny W. Armstrong, Chancellor**

**No. W2012-00216-COA-R3-CV - Filed December 26, 2012**

This is a breach of contract case. Appellant/Homeowner contracted with Appellee for the installation of a "smart home" system. After myriad problems arose, Appellant fired Appellee, who filed the instant lawsuit to collect the unpaid balance for equipment and installation. The trial court determined that the primary purpose of the parties' agreement was the sale of goods and applied Article 2 of the Uniform Commercial Code. The court granted judgment in favor of Appellee, but allowed certain offsets for items rejected by Appellant. Appellant appeals, arguing that the trial court erred in applying the UCC, and in its calculation of damages. Appellant also appeals the trial court's determination that the Tennessee Consumer Protection Act does not apply. Discerning no error, we affirm.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Chancery Court Affirmed**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and HOLLY M. KIRBY, J., joined.

Edward M. Bearman, Memphis, Tennessee, for the appellant, Stephen Tanzer.

Randall J. Fishman and Richard S. Townley, Memphis, Tennessee, for the appellee, Audio Video Artistry.

### OPINION

On or about March 26, 2004, Appellant Stephen Tanzer and Appellee Audio Video Artistry ("AVA") entered into discussions for the sale and installation of electronic and entertainment equipment in Mr. Tanzer's home. AVA is a residential entertainment and communications firm specializing in custom design projects. AVA is a general partnership; its partners, Chris Rogers and Brad Parsley, founded the firm in 1999 to offer state-of-the-art

home theater, multi-room music and television, lighting control and phone/intercom systems. The sale, installation, and integration of these systems for the creation of a "smart home" (also known as "domotics") is AVA's specialty.

In March 2004, Chris Rogers met with Mr. Tanzer to discuss Mr. Tanzer's desires for the home he was building. Based upon their discussion, AVA submitted a proposal to Mr. Tanzer for components, parts, and installation, totaling $78,567.13. The written proposal specifically provided for the following work:

- 6 "independent" zones of music consisting of 13 rooms and related equipment to switch, power, and control the music system;
- phone system throughout the house with door communications;
- lighting control system throughout the house to include 64 standard wattage (600w) loads;
- network wiring for television, phone, music, and computers throughout the home.

The systems pricing for this work (i.e., the total price of $78,567.13) was broken out in the original proposal as follows:

- Equipment: $56,375.00
- Labor/Programming: $9,880.00
- Cable: Misc. Parts: $5,660.00
- Total: $71,915.00
- Tax: $6,652.13

On September 22, 2004, AVA and Mr. Tanzer entered into a written contract, which incorporates the original proposal, adding an additional "seventh zone" for music, and also adding seven automated shades. These shades were included as a "purchase incentive" at no cost to Mr. Tanzer. The contract provides that, in the event the shades do not work in an acceptable fashion, Mr. Tanzer would receive an additional $8,400 credit. The contract further contemplates that Mr. Tanzer's needs and desires for the "smart system" would likely evolve during the course of the project; therefore, the contract specifically provides that "[v]erbal agreements throughout the life of the project may also be honored as part of this contract and will be documented by AVA."

As originally contemplated, the contract called for a Concierge whole-house audio system. The audio/visual items were to be integrated via the Crestron system, which would

allow Mr. Tanzer to play music in the seven, independently-controlled music "zones."[1] Remote control "touch-panels" would control and integrate DVD, television, music, and other smart home functions. The contract further included a Lutron automated lighting system, which would be integrated into the Crestron system, along with an intercom/phone/whole house networking system.

At the time the parties entered their contract, construction had just commenced on Mr. Tanzer's home. The home is not a usual residence; rather, it is an approximately 15,000 square foot, $3.5 million dollar build. Because of the size and scope of the project, AVA was to install certain wiring and equipment during the construction process. Pre-wiring began on the house as the framing went in, but equipment installation and programming of the smart system did not begin in earnest until March, 2006. Mr. Tanzer and his family moved into the home in April, 2006.

During the project, and as contemplated in the contract, the original scope of work was changed and AVA performed additional work. One significant change was the decision to use an Escient music system in lieu of the Concierge music system. Mr. Rogers allegedly represented to Mr. Tanzer, after the job had begun, that the Escient system was better able to do what Mr. Tanzer wanted, i.e., stream music from his PC, which was not a function that the Concierge system offered. AVA agreed to sell and install the Escient system for the same price as the Concierge system. Later, an art frame and shade were also added to conceal the television in the sitting room. The "art shade" is a custom-painted, frame-mounted piece of artwork on canvas, which can be rolled down to conceal a television at the push of a button. Other changes related to the Crestron touch panels, which were changed from radio-frequency panels to Wi-Fi panels (Crestron came out with a Wi-Fi product before installation commenced). The Wi-Fi panels were changed at the same cost as that previously quoted for the radio-frequency panels. Another change was the switch in the music distribution equipment, which would allow for future expansion of the system. Further changes included equipment for the media room and five additional pairs of speakers. AVA also integrated the pool system, the alarm system, and the HVAC system with the Crestron control system.

Mr. Tanzer eventually became unsatisfied with AVA's work. Mr. Tanzer contends that, based upon Mr. Parsley's statements, he thought that the installation, programming, and

---

[1] Crestron Electronics is a company that manufactures systems for home automation and audio/video control. The hardware developed by Crestron includes programmable controllers including touch panels, keypads, and lighting control systems. It sells its products through dealers who purchase and install Crestron systems for residential and commercial automation.

debugging of the "smart home" system would take less than three months. However, Mr. Tanzer claims that, after fifteen months, he was still having significant problems with the functionality of the system. Specifically, Mr. Tanzer states, in his brief, that: (1) the punch list ebbed and flowed; (2) [t]he programming was unstable; (3) "[i]t seemed every time AVA would come out to resolve one problem, two or three new problems would crop up in its place;" (4) [t]hings that AVA fixed didn't stay fixed. As a result, Mr. Tanzer became "extremely frustrated and inconven[ienced]." To compound these alleged issues, in July, 2006, the basement of the house flooded, damaging the media room. A year later, in July of 2007, while AVA was allegedly still trying to "debug" the system, the home was struck by lightning. The power surge from the lightning caused damage to the Crestron processor and Ethernet card. Although the damaged components had no warranty against "Acts of God," it is not disputed that AVA replaced them without additional charge. In August 2007, Mr. Tanzer fired AVA and requested a final billing.

Both the original equipment and work and the additional work, equipment, and changes were set out in Invoice #3036, which was presented by AVA to Mr. Tanzer. This Invoice shows a total project cost of $119,402.15, and reflects an outstanding balance of $43,824.55. Mr. Tanzer disputed this balance and the instant lawsuit ensued.

On November 19, 2007, AVA filed suit against Mr. Tanzer for breach of contract. On December 31, 2007, Mr. Tanzer filed his answer, in which he denies any liability. Concurrent with the answer, Mr. Tanzer filed a counter-complaint against AVA, alleging that AVA breached the contract and seeking damages for the breach. AVA answered the counter-complaint, denying any liability.

After the lawsuit had commenced, in February or March of 2008, a second lightning strike to the house shut down the entire "smart home" system. Mr. Tanzer then hired Marquis Home Solutions ("Marquis") to make repairs. Tom Brown, an employee of Marquis, testified that there were numerous problems with AVA's installation of the systems, including: (1) improper power source to the Lutron processor; (2) improper surge protection; (3) failure to install the Lutron processor in a proper recessed and covered enclosure; (4) failure to label wiring and improper wiring; (5) instability of the Wi-Fi handles for the Crestron system. Marquis charged Mr. Tanzer $67,587 for the repairs. Mr. Tanzer avers that the amount Marquis charged includes only the cost of repairs to the systems that AVA installed, and does not include the price of any upgrades.

The parties filed various trial briefs, which are incorrectly included in this record. Tenn. R. App. P. 24(b) ("The following papers filed in the trial court are excluded from the record. . . (4) trial briefs. . . ."). Regardless, on May 19, 2011, the trial court entered its preliminary findings of fact and conclusions of law, which were based upon the parties'

briefs.  Therein, the court states, in relevant part, that:

> [T]he Court finds that the parties' agreement in this matter involved the sale of consumer goods governed by the Uniform Commercial Code found at T.C.A. §47-2-101 et seq.  Although the parties' agreement involved some provision of labor and services, an examination of the entire transaction and application of the "predominant factor" test, leads the Court to the conclusion that this was simply an agreement for the sale and installation of electronic equipment.  The labor and services provided under the terms of the parties' agreement was insignificant in comparison to the cost of equipment provided.  As such, the Uniform Commercial Code is applicable to this transaction and the Court is required to consider its provisions in determining the rights and remedies afforded the parties under the agreement in this case.

The trial court then allowed additional time for the parties to prepare and present supplemental evidence on the issue of remedies under the Uniform Commercial Code ("UCC").  In addition, the preliminary findings of fact include a specific finding that the Tennessee Consumer Protection Act ("TCPA") is not applicable to the case.  Specifically, the court found that there was insufficient proof to show that AVA had "engaged in any unfair or deceptive acts or practices," and that there was "insufficient proof that Chris Rogers held himself out to [Mr. Tanzer] as an electrical engineer."

In response to the trial court's preliminary findings, Mr. Tanzer filed a motion for reconsideration on June 14, 2011.  AVA opposed the motion, which was ultimately denied by the trial court's July 22, 2011 order.  By order of October 17, 2011, the trial court granted judgment in favor of AVA.  The order includes the following, relevant, findings:

> 1. That within a reasonable time after delivery and installation of the equipment involved in the parties' contract, AVA had actual knowledge and notice that the Escient music system and phone system did not perform properly even after repeated attempts by AVA to fix the problems complained of by Tanzer.  As such, the Court finds from the proof that these items were never accepted by Tanzer and were rejected in accordance with the requirements of the UCC.
>
> 2. That, under the facts in this case, Tanzer is entitled to an

offset for these items in the amounts indicated below:

a.  Escient Music System          $14,098.00
b.  Phone System                  $3,825.00

3.  That in addition to these offsets against the balance owed AVA, Tanzer is entitled to the following credits for items that were improperly charged:

a.  5 Sonance volume controls     $400.00
b.  4 Lutron switches             $1,200.00
c.  Overcharge on wire run        $330.00

4.  That the charges paid to Marquis Solutions by Tanzer are not appropriate for a consequential damage claim under the facts here.   Marquis made extensive upgrades and changes to Tanzer's whole house system and there was insufficient detail in Mr. Brown's testimony regarding the specific work performed and the amount charged for each specific item for the Court to make an award for consequential damages. Additionally, the Court has offset the amount owed by Tanzer for the items that were rejected.  Tanzer is not entitled to an offset for the rejected items and to receive an award for repairs to these items.  It is also noted that Marquis' repair bill is unreasonably high and grossly exceeds the amount charged by AVA for these items in its contract with Tanzer.

5.  That HVAC integration was not included in AVA's original proposal to Tanzer.  I further find from the proof that AVA completed this additional work at Tanzer's request and is entitled to the amount charged for this work.  Tanzer also failed to prove that the HVAC integration was not functioning properly when AVA completed its work.

6.  That Tanzer failed to establish through his proof that AVA had any responsibility for the lightning strike which damaged some of the components installed by AVA and which was later repaired by Marquis.  As such, Tanzer is not entitled to recover for the amount charged by Marquis for such repairs.

7. That AVA is entitled to the equipment rejected by Tanzer which is in his possession. Tanzer is hereby ordered to make these items available to AVA if requested by AVA.

Based upon the foregoing findings, the court awarded offsets and credits to Mr. Tanzer in the total amount of $19,842.00. Accordingly, AVA was awarded judgment in the amount of $23,982.55. On October 31, 2011, AVA filed a motion to alter or amend the judgment under Tennessee Rule of Civil Procedure 59. The motion was granted and, on December 12, 2011, the trial court amended its previous order as follows:

The Court, in its original order, granted an offset of the Escient music system in the amount of $14,098.00. It appears to the court that the record reflects that the Escient music system was a total of $2,500.00, and not $14,098.00.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that the order of judgment entered in this matter on October 17, 2011, be and is hereby amended to reflect that the credit for the Escient music system shall be $2,500.00, and not $14,098.00.

With the amendment, AVA's total judgment was increased from $23,982.55 to $35,580.55. Upon Mr. Tanzer's motion, the judgment was stayed pending appeal. By separate order, entered on February 23, 2012, the trial court also denied both parties' requests for attorney's fees and costs.

Mr. Tanzer appeals. He raises four issues for review as stated in his brief:

I. The trial court erred in finding that the UCC applied to the services rendered by AVA.

II. The Court erred in not declaring the failure to complete its work a material breach on the part of AVA and denying damages to [Tanzer].

III. The trial court erred in not awarding Tanzer the cost incurred to make the system work properly and get the benefit of his bargain.

IV. The trial court erred in finding that AVA did not violate the

Tennessee Consumer Protection Act.

Because this case was tried by the trial judge without a jury, we review the trial court's findings of fact *de novo* with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). No presumption of correctness, however, attaches to the trial court's conclusions of law and our review is *de novo*. ***Bowden v. Ward***, 275 S.W.3d 913, 916 (Tenn.2000). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. ***Walker v. Sidney Gilreath & Assocs.***, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); ***The Realty Shop, Inc. v. R.R. Westminster Holding, Inc.***, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)).

## I. Applicability of UCC Article 2

In his first issue, Mr. Tanzer asserts that the trial court erred in applying UCC Article 2 to his contract with AVA. Specifically, Mr. Tanzer argues that thrust of the contract is for services and not for the sale of goods such that common-law breach of contract principles apply. We begin our analysis with 67 Am. Jur. 2d <u>Sales</u> § 37, which provides:

> Article 2 [of the UCC] applies to transactions in goods but does not apply to construction contracts or contracts for the rendition of services. However, the existence of a sale in and of itself does not automatically implicate the Uniform Commercial Code. In many cases, a contract or transaction may involve both the transaction of a sale and the rendition of services, presenting a "mixed" or hybrid transaction or contract. To determine whether such "mixed" or "hybrid" contracts are governed by Article 2, a court must examine the whole transaction and look to the essence or main objective of the parties' agreement or the primary or overall purpose of the transaction.
>
> Ordinarily, a court determines whether a mixed contract for goods and services is subject to Article 2 by considering whether the contract, reasonably stated, is for goods with labor incidentally involved or for services with goods incidentally involved. The question is generally one of fact, involving a consideration of the contract in its entirety. Depending upon whether the contract or transaction is predominantly for the sale of goods or the rendition of services, Article 2 applies to the entire contract or not at all.

*Id*. (footnotes omitted).   As further discussed in 1 Stephen W. Ramp & Katherine Simpson Allen, Tennessee Practice: Uniform Commercial Code Forms §2-106 (2d ed. 2002):

> A sale is the passing of title from the seller to the buyer for a price. Courts will consider the substance of the transaction rather than how the parties chose to label the transaction. Where the service component of a contract for sale overrides the goods aspect of the transaction it will not fall within Article 2 once the transaction is determined to be a service and not a sale.

The question of whether UCC Article 2 or common-law contract principles apply is important in terms of available warranties and the measure of damages.  As discussed in R. Alan Pritchard, The Predominant Factor Test under the Uniform Commercial Code, Tenn. B. J., July, 2001, at 23:

> Article 2 of the Uniform Commercial Code (UCC) sets forth the provisions that govern certain sales transactions involving goods. The provisions establish the terms that will govern such a transaction including, among other items, warranty provisions, remedies provisions for both the buyer and the seller, and damages provisions. Section 2-313 establishes the express warranty that governs the sales transaction, and §§ 2-314 and 2-315 establish the implied warranties of merchantability and fitness for a particular purpose. All of these warranties are subject to exclusion under the sales contract between the parties; however, such exclusions must be in accordance with the specific provisions of the Uniform Commercial Code. In the event there is a breach of these warranties, the Uniform Commercial Code sets forth the remedies that are available for such breach. A claim for breach must be brought within four years from the date the cause of action accrues. See UCC 2-725. The cause of action accrues at the time the breach occurs, which is at the time the tender of delivery is made. See 2-725.

As noted above in 67 Am. Jur. 2d Sales § 37, many transactions are neither pure sale of goods nor pure service transactions, but a combination of the two, i.e. a hybrid contract. As discussed in Barkley Clark and Christopher Smith, The Law of Product Warranties §2:19 (2012):

> When faced with these hybrids, the courts have generally

employed a predominant element test: If the service aspect predominates, tort theories must control (even as to defective goods), but if the goods aspect predominates, Article 2 warranties come into play (sometimes even with respect to the service component). This is a rather mechanical approach, but the courts favor it. Sometimes they are swayed by the wording of the contract, as when the plaintiff is denominated as an "owner" rather than a "buyer," and the defendant is denominated as the "contractor" rather than the "seller." Sometimes the courts look at the price factor, attempting to analyze the billing, and sometimes the decision is based on nothing more than a judicial hunch as to which element predominates. In the usual case, the plaintiff will push to persuade the court that the goods element predominates, so the more lenient standard of the Article 2 implied warranties can be used to measure liability, and the defendant will shove in the opposite direction in a real tug-of-war.

*Id*. (footnotes omitted). One of the earliest cases to adopt the predominant purpose test was ***Bonebrake v. Cox***, 499 F.2d 951 (8th Cir. 1974), which involved a contract for the sale and installation of pre-fabricated bowling equipment. The ***Bonebrake*** Court noted that such hybrid contracts are legion and then proposed its test:

The test for inclusion or exclusion is not whether they are mixed, but granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (e.g., contract with artist for painting), or is a transaction of sale, with labor incidentally involved (e.g., installation of a water heater in a bathroom).

*Id*. at 960. In ***Bonebrake***, the court concluded that the goods element predominated, thus invoking the rules of Article 2, including the warranty provisions. *Id*.

In the case of ***Pass v. Shelby Aviation***, No. W1999-00018-COA-R9-CV, 2000 WL 388775 (Tenn. Ct. App. April 13, 2000), Tennessee adopted and applied the ***Bonebrake*** predominant purpose test. Applying the test, the ***Pass*** Court determined that a mixed transaction of goods and services was "predominantly the provision of a service, not subject to the warranty provisions of the UCC." *Id*. at *6. In that case, Max E. Pass, Jr., and his wife, Martha N. Pass, were both killed when their aircraft, piloted by Mr. Pass, crashed

outside of Opelika, Alabama. Approximately four-and-one-half months prior to the fatal flight, Mr. Pass had taken the aircraft to defendant, Shelby Aviation, Inc., for inspection and service. During the servicing, Shelby Aviation replaced both rear wing attach point brackets on the plane.

After the crash, the administrators of the Pass's estates filed a lawsuit against Shelby Aviation. The suit alleged that the rear wing brackets, which were sold and installed by Shelby Aviation, were defective and asserted claims for breach of common-law warranties, and for breach of express and implied warranties under Article 2 of the UCC. Shelby Aviation filed a motion to dismiss for failure to state a claim, contending that, because the contract was primarily for services, Article 2 did not apply. The motion was denied, and Shelby Aviation requested, and was granted, permission to file an interlocutory appeal to this Court. The main issue on appeal was whether the transaction between Mr. Pass and Shelby Aviation was governed by Article 2.

This Court determined that the predominant purpose test was the appropriate test to apply because it looks at the transaction as a whole. In applying the test, the Court stated:

> In order to determine whether the predominant purpose of a mixed transaction is the sale of goods or the provision of a service, we examine the language of the parties' contract, the nature of the business of the supplier of the goods and services, the reason the parties entered into the contract (i.e. what each bargained to receive), and the respective amounts charged under the contract for goods and for services. *Ogden Martin Sys. of Indianapolis, Inc. v. Whiting Corp.*, 179 F.3d 523, 530–31 (7th Cir. 1999) (citing *Insul-Mark Midwest, Inc. v. Modern Materials*, Inc., 612 N.E.2d 550, 555 (Ind. 1993)); *Coakley & Williams, Inc. v. Shatterproof Glass Corp.*, 706 F.2d 456, 460 (4th Cir. 1983). None of these factors alone is dispositive. *BMC Industries, Inc. v. Barth Industries, Inc.*, 160 F.3d 1322, 1330 (11th Cir. 1998). The party seeking application of the UCC bears the burden of proof to show that the predominant purpose of the contract was the sale of goods. *Insul-Mark*, 612 N.E.2d at 555; *Northwestern Equipment, Inc. v. Cudmore*, 312 N.W.2d 347, 351 (N.D. 1981).

*Pass*, 2000 WL 388775, at *4. In concluding that the foregoing relevant factors should be considered in determining the choice of law for mixed contracts for sales of goods and service, the *Pass* Court relied upon an Indiana Supreme Court Case, *Insul-Mark Midwest,*

*Inc. v. Modern Materials*, Inc., 612 N.E.2d 550 (Ind. 1993), wherein the Indiana Court stated:

> To determine whether the predominant thrust of a mixed contract is to provide services or goods, one looks first to the language of the contract, in light of the situation of the parties and the surrounding circumstances. Specifically one looks to the terms describing the performance of the parties, and the words used to describe the relationship between the parties.
>
> Beyond the contractual terms themselves, one looks to the circumstances of the parties, and the primary reason they entered into the contract. One also considers the final product the purchaser bargained to receive, and whether it may be described as a good or a service.
>
> Finally, one examines the costs involved for the goods and services, and whether the purchaser was charged only for a good, or a price based on both goods and services. If the cost of the goods is but a small portion of the overall contract price, such fact would increase the likelihood that the services portion predominates.

*Pass*, 2000 WL 388775, at *4 (citing *Insul-Mark*, 612 N.E.2d at 555 (citations omitted)).

Applying the foregoing principles, the *Pass* Court determined that "the invoice clearly emphasizes the repair and inspection aspects of the transaction, indicating that the predominant purpose was the sale of service, with the sale of goods incidental to that service." *Pass*, 2000 WL 388775, at *4. Further, the overall nature of Shelby Aviation's business was service rather than the sale of parts, and "Mr. Pass took the plane to Shelby Aviation primarily to have a service performed, i.e., the annual inspection." *Id*. at *5. Finally, the court looked to allocation of costs between goods and services. *Id.* The court indicated that it did not favor adding the labor charges for installing the parts to the cost of the parts as was proposed by the plaintiffs, and then the court stated that:

> Regardless of how the percentage of the cost of goods is calculated, viewing the transaction as a whole, we must conclude that the predominant purpose of the transaction was the provision of a service rather than the sale of goods …. As such, it is not subject to the warranty provisions of Article 2 of

-12-

the UCC. Shelby Aviation is entitled to judgment as a matter of
law on the [p]laintiffs' UCC breach of warranty claims.

*Id*. at \*6. The decision denying Shelby Aviation's motion for summary judgment on the UCC breach of warranty claims was reversed, and the case was remanded for further proceedings. **Id**.

From **Pass**, we understand that, in applying the predominant purpose test, the court looks to four factors:

> (1) the language of the contract;
> (2) the nature of the business of the supplier of goods and services;
> (3) the reason the parties entered into the contract, and
> (4) the amounts paid for the rendition of the services and goods, respectively.

We now turn to address each of these factors based on the evidence contained in the record to determine whether the trial court correctly found that the contract at issue in this case predominantly involves the sale of goods such that UCC Article 2 is applicable.

A. *Language of the Contract*

The first factor set out by the **Pass** Court requires us to look "to the language of the contract, in light of the situation of the parties and the surrounding circumstances. Specifically, [the court] looks to the terms describing the performance of the parties, and the words used to describe the relationship between the parties." **Pass**, 2000 WL 388775, at \*4 (quoting **Insul-Mark**, 612 N.E.2d at 555). Contractual language that refers to the transaction as a "purchase," for example, or identifies the parties as the "buyer" and "seller," indicates that the transaction is for goods rather than services. *See* **Bonebrake**, 499 F.2d at 958 (stating that language referring to "equipment" is peculiar to goods rather than services); **Bailey v. Montgomery Ward & Co.**, 690 P.2d 1280, 1282 (Colo. Ct. App. 1984) (holding that a contract that identifies the transaction as a "purchase" and one of the parties as the "customer" signals a transaction in goods); **Meeker v. Hamilton Grain Elevator Co.**, 442 N.E.2d 921, 923 (Ill. Ct. App. 1982) (stating that a contract that calls the parties "seller" and "purchaser" indicates a contract for goods).

Turning to the contract between Mr. Tanzer and AVA, we first note that it is titled "Systems Sale and Installation Contract." From the plain language, it is clear that this is a hybrid contract, contemplating both the sale of goods and the installation of the goods. The

question, then, is whether the language, when viewed in context, indicates the predominant purpose of the contract.

Throughout the contract, Mr. Tanzer is referred to as the "purchaser," a term that connotes a sale of goods contract. *Bonebrake*, 499 F.2d at 958. In various sections, the contract states that: (1) "[p]er this contract, AVA agrees to deliver and install **equipment** included in the proposal;" (2) "AVA retains ownership of the **equipment** until contract is paid in full;" (3) "Delays. . .by parties other than AVA that prohibit proper installation of **delivered equipment** shall not delay payment . . . ;" (4) "Prices are subject to change on items . . . between the time of execution of this contract and the **delivery of goods**;" (5) "All **pre-paid goods** shall be delivered at the price agreed;" (6) "Model numbers may change . . . therefore **Product** delivered may no t. . . be the same model number agreed to in the Proposal;" and (7) "Final installation of most **electronic hardware** corresponds with purchaser['s] actual move-in date . . . ." (Emphases added). As noted in *Bonebrake*, "equipment" is a term of art, which is "peculiar [to the sale of goods.]" *Bonebrake*, 499 F.2d at 958. Furthermore, the contract incorporates, by reference, the earlier proposal, which sets out the specific equipment that AVA would install in the Tanzer home.

In his brief, Mr. Tanzer urges this Court to read the disputed contract as a construction or building contract based, *inter alia*, upon the fact that the equipment and installation occurred during the building process and the items installed allegedly became part of the completed home. In support of his argument, Mr. Tanzer relies upon the case of *Aluminum Vinyl Sales Company v. Woerz*, No. 03A01-9304-CV-00172, 1993 WL 367125 (Tenn. Ct. App. Sept. 20, 1993). *Woerz* involved a contract for the installation of vinyl siding on a home. In pertinent part, the *Woerz* Court stated:

> "The Uniform Commercial Code does not apply to a contract for the rendition of services or to construction contracts." The subject matter of the contract before us is to furnish "all the materials and labor necessary for" the installation of vinyl siding to the entire exterior of Defendant's house.
> A contract to furnish a movable thing and affix it to the freehold is not a contract for the sale of goods, but one to furnish materials and affix them to the freehold by work and labor, and, until the materials are affixed, title to the materials does not pass.

1993 WL 367125, at *3 (citing 67 Am. Jur.2d, Sales, § 39 (1985); 77 C.J.S., Sales, § 2, p. 585). Despite Mr. Tanzer's reading of *Woerz*, we cannot extend its holding so far as to conclude that it stands for the proposition that any and all contracts that contemplate the sale

of goods, which are installed in a home or affixed to realty, are to be construed as predominantely service contracts.  Rather, as noted in 1 Barkley Clark and Christopher Smith, The Law of Product Warranties § 2:22 (2012):

> Contracts for the installation of products that were identifiable goods before installation and that, when installed, constitute only a small portion of a total building, are covered by Article 2. . . .  As long as the transaction involves defective products that were moveable before installation and thus once qualified as 'goods' under § 2-105(1), the courts assume that the service elements are also covered.

*Id*.  Accordingly, cases have held that the installation of the following are all sale of goods: (1) carpet, *Snyder v. Herbert Greenbaum & Associates, Inc.*, 380 A.2d 618 (Md. Ct. App. 1977), *Colorado Carpet Installation, Inc. v. Palermo*, 668 P.2d 1384 (Colo. 1983); (2) electrical equipment, *E. C. Ernst, Inc. v. Manhattan Const. Co. of Texas*, 551 F.2d 1026 (5th Cir. 1977); (3)  trees, shrubs and sod, *Burton v. Artery Co., Inc.*, 367 A.2d 935 (Md. 1977); (4) steel lockers, *Anderson Const. Co., Inc. v. Lyon Metal Products, Inc.*, 370 So. 2d 935 (Miss. 1979); (5) overhead doors, *Meyers v. Henderson Const. Co.*, 370 A.2d 547 (N.J. Super. 1977); (6) water heaters, *Shapiro v. Long Island Lighting Co.*, 71 A.D.2d 671 (N.Y. 1979); (7) a furnace, *O'Laughlin v. Minnesota Natural Gas Co.*, 253 N.W.2d 816 (Minn. 1977);  (8) an air-conditioning system, *B & B Refrigeration & Air Conditioning Service, Inc. v. Haifley*, 1978 WL 23510 (D.C. Super. Ct. Nov. 6, 1978); and (9) interior window panels, *The Plantation Shutter Co. v. Ezell*, 492 S.W.3d 404 (S.C. 1997).

In *Glazer, etux v. Tri-State Tile and Marble Co., Inc.*, 1985 Tenn. App. LEXIS 2767 (Tenn. Ct. App. March 22, 1985), a suit for breach of express warranty in connection with the resurfacing of plaintiffs' patio with "prairie film," which is "a mixture of epoxy and very fine gravel,"  *Id*. at *1, this Court noted that, in cases "involving building useful improvements out of raw materials," courts have held that these contracts are "outside the scope of the U.C.C." *Id*. at *3.  Such cases involved: (1) the sale and installation of blacktop, *Rose Acre Farms v. L.P. Cavett Co.*, 279 N.E.2d 280 (Ind. Ct. App. 1972); (2) construction of a house with a builder furnishing all materials and labor, *Vernali v. Centrella*, 266 A.2d 200 (Conn. Sup. Ct. 1970); and (3) construction of electrical equipment, *Mainland v. Alfred Brown Co.*, 461 P.2d 862 (Nev. Sup. Ct. 1969).  On the other hand, in cases where the courts have found the contract to be one for the sale of goods, and thus governed by the UCC, "the items therein involved have been tangible things, movable at the time they are identified to the contract and where installation has not been a major or predominant factor in the contract." *Glazer*, 1985 Tenn. App. LEXIS 2767, at *3.  Such cases involved: (1) installation of water tank, *Moines Steel Co. v. Brookhaven Manor Water Co.*, 532 F.2s 572 (7th Cir.

-15-

1976); (2) installation of a bowling alley and equipment, **Bonebrake**, 499 F.2d at 951; and (3) installation of a liner for the bottom of a swimming pool, **Riffey v. Black**, 548 S.W.2d 175 (Ky. Ct. App. 1977). The **Glazer** Court applied the foregoing principles in reaching its conclusion that the installation of "prairie film" is not a sale of goods. In reaching its holding, the Court noted:

> [T]his is clearly not a sale of "goods," but is closely akin to some of the cases cited above, such as, the sale and installation of a blacktop driveway, or building or painting a house. We see no difference between installing a Prairie Film system over a patio and overlaying the patio with concrete or quarry tile. Plaintiffs were contracting to obtain a service from the defendant, not to purchase a quantity of gravel.
>
> By the same token, materials, such as the Prairie Film, when attached to realty, such as a patio cover, lose their character as goods. *See* T.C.A. §47-9-313. Once the patio was resurfaced by defendant the resurfacing lost any characteristics of personalty and became part of an improvement of the real estate, not severable therefrom.

**Glazer**, 1985 Tenn. App. LEXIS 2767, at *3.

Tennessee Code Annotated Section 47-2-105 sets out the current definition of "goods" under the UCC. The statute provides, in relevant part, that: "'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale. . . ." The comments to the code section clarify that: "The definition of goods is based on the concept of movability. . . . It is not intended to deal with things which are not fairly identifiable as movables before the contract is performed." The comment goes on to explain that:

> The use of the word "fixtures" is avoided in view of the diversity of definitions of that term. This Article in including within its scope "things attached to realty" adds the further test that they must be capable of severance without material harm thereto. As between the parties any identified things which fall within that definition becomes "goods" upon the making of the contract for sale.

In light of the foregoing statutory provisions, the holding in **Glazer** is still applicable.

-16-

Because the "prairie film" became "attached to the realty," such that it could not be removed "without material harm" to the structure, the Court correctly held that the contract was one for service, thus excluding application of the UCC. By contrast, in *Highland Rim Constructors v. Atlantic Software Corp.*, No. 01-A-01-9104CV00147, 1992 WL 184872 (Tenn. Ct. App. Aug. 5, 1992), this Court held that a contract involving the sale of a computer system to a construction company was a sale of goods contract. The Court noted that the contract was a hybrid contract, involving both sale of goods and service. The Court then applied the predominant purpose test to determine that the UCC applied to the transaction; in so holding, the Court stated:

> Other courts, using the predominant [purpose] test, have found that contracts for the sale of computer systems or related components, including hardware, software, training, and support services, are contracts for the sale of goods governed by Article 2. *RRX Indus., Inc. v. Lab-Con, Inc.*, 772 F.2d 543, 546 (9th Cir. 1985) (software, training, systems repairs, and upgrades); *Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737, 742-43 (2d Cir. 1979) (hardware and software); *Nelson Business Equip. Ctr., Inc. v. Monteleone*, 524 A.2d 1172, 1174 (Del. 1987) (computer system); *USM Corp. v. Arthur D. Little Sys., Inc.*, 546 N.E.2d 888, 894 (Mass. App. Ct. 1989) (computer system); *Communications Group, Inc. V. Warner Communications, Inc.*, 527 N.Y.S.2d 341, 344 (N.Y. Civ. Ct. 1988) (software); *Camara v. Hill*, 596 A.2d 349, 351 (Vt. 1991) (computer system).
>
> We agree with the reasoning of these precedents. Atlantic's agreement with Highland Rim was predominately for the sale of an integrated computer system. Its obligation to provide training in the use of the system was incidental to the purchase of the system itself. Accordingly, the transaction is one involving goods, and the parties' rights are governed by Article 2.

*Highland Rim Constructors*, 1992 WL 184872, at *6. We find the reasoning and cited cases in *Highland Rim* persuasive in the instant appeal. As set out in the contract, and in the incorporated proposal, it is clear that the contract contemplates the sale of various, moveable components, which were to be integrated via a control system. Unlike the *Glazer* case, the fact that the components were installed in the home did not result in an attachment that would change the moveability of the goods sold. Accordingly, we are not persuaded by Mr.

-17-

Tanzer's argument that the integration of the components constitutes a "construction" contract. The plain language of the contract simply does not support such a finding.

## B. *Nature of AVA's Business*

In addition to the plain language of the contract, the court may also consider the nature of the seller's business. *Pass*, 2000 WL 388775, at *4. It is not disputed in the record that AVA is in the business of design and sale of custom, state-of-the-art, home theater, multi-room music/television/lighting control, and phone/intercom systems. AVA does not manufacture or promote one brand of product; rather, it sells and installs products from various manufacturers. From our review of the record, it appears that AVA's "design" role really constitutes a determination of what goods the customer needs and what integration system(s) will work to link the various components. In this sense, the "integration" of the whole system is done by the controlling system, i.e., Escient, Concierge, Crestron, Lutron. The sale of these respective systems is, in the opinion of this Court, similar to the sale of an integrated computer system. *See* **Highland Rim Constructors**, 1992 WL 184872, at *6–7. The installation and service that AVA performs is incidental to the overarching purpose of its business, which is to sell "smart home" components.

## C. *Reason for the Contract*

The third factor instructs the court to "consider the final product the purchaser bargained to receive, and whether it may be described as a good or a service." *Pass*, 2000 WL 388775, at *12 (quoting **Insul-Mark**, 612 N.E.2d at 555). Whether the purchaser sought to procure a good or a service by entering into the subject contract is "a strong indication of the predominant purpose of the contract." *Id*. at *15 (citing **Stafford v. Int'l Harvester Co.**, 688 F.2d 142, 147 (2d Cir. 1981) ("underlying nature of a hybrid transaction is determined by reference to the purpose with which the customer contracted with the defendant")); **NW Equip. Inc. v. Cudmore**, 312 N.W.2d 347, 349 (N.D. 1981) ("**Bonebrake** test looks to the predominant purpose or thrust of the contract as it would exist in the minds of reasonable parties.")). In analyzing this factor, the **Pass** Court found guidance from the Michigan Supreme Court, in **Neibarger v. Universal Cooperatives, Inc.**, 486 N.W.2d 612 (Mich. 1992), wherein the Michigan court described its analysis of the purpose of the parties' dealings as follows:

> If the purchaser's ultimate goal is to acquire a product, the contract should be considered a transaction in goods, even though service is incidentally required. Conversely, if the purchaser's ultimate goal is to procure a service, the contract is not governed by the UCC, even though goods are incidentally

required in the provision of this service.

*Id.* at 622.

As discussed above, even in cases where labor and services were contemplated by the parties to be an integral part of the contract, courts have still held that Article 2 applies. *See, e.g.,* ***Highland Rims Constructors***, 1992 WL 184872*,* at *7 (noting that the seller's "obligation to provide training in the use of the system was incidental to the purchase of the system itself."); *see also* ***IBP, Inc. v. HK Sys.***, No. 98cv00480, 2000 WL 35725320 (D. Neb. Sept. 21, 2000) (holding that contract for purchase of a computer system was a sale of goods, with rendition of services such as design, construction, manufacturing and installation incidental); ***Bonebrake***, 499 F.2d at 958 (holding that installation of pre-fabricated bowling lanes incidental to the contract because the lanes remained "movable"); ***Meyers v. Henderson Constr. Co.***, 370 A.2d 547, 549 (Sup. Ct. N.J. 1977) (holding that installation of pre-fabricated disassembled doors was incidental to the contract for sale of the tangible goods).

Turning to the record in the instant case, in his answer, Mr. Tanzer admits that he contracted for electronic equipment. It is not disputed that AVA orders all of the equipment it sells from the manufacturer or from the distributor. In other words, none of the equipment was "constructed" at Tanzer's home; it was merely installed there. The record further indicates that the equipment maintained its characteristics as personalty and was never rendered immovable from the residence. In support of this conclusion, Mr. Tanzer presented a spreadsheet at trial, which indicated all of the equipment he was willing to return to AVA. The fact that Mr. Tanzer could return this equipment supports a finding that it had not become a permanent improvement to his realty. The fact that the original proposal, which was incorporated into the contract, breaks apart the costs of the "equipment," i.e., tangible goods, from the cost of "cable/misc. parts," i.e., materials also supports a finding that Mr. Tanzer bargained for the purchase of equipment, and that the services rendered by AVA in connection with that sale, including delivery and installation, were necessary but incidental to the ultimate purpose of the contract, i.e, to obtain the various components and the integration system that would link them.

D. *Amounts Paid for Services and Goods, Respectively*

The final factor to be considered is the respective amounts charged under the contract for the goods and services. ***Pass***, 2000 WL 388775, at *4. "If the cost of the goods is but a small portion of the overall contract price, such fact would increase the likelihood that the services portion predominates." *Id*. at *12 (quoting ***Insul-Mark***, 612 N.E.2d at 555). Conversely, where "the charge for goods exceeds that for services, the contract is more likely

to be for goods." ***BMC Indus.***, 160 F.3d at 1330 (citations omitted).

In this case, the trial court found that the costs of labor and services were "insignificant" compared to the cost of the equipment. As set out above, under the original contract, equipment sales constituted $56,375 of the total price of $71,915 (before taxes); on the other hand, labor accounted for only $9,880. In the final invoice, equipment totaled $89,640.03 of the total contract price of $109,830.03 (before taxes), with labor constituting only $13,260.00. Viewed as a percentage, equipment constitutes roughly 82% of the final contract price. Accordingly, this factor weighs heavily in favor of a finding that the contract was predominantly for the sale of goods.

Based upon the foregoing, we conclude that all four of the ***Pass*** factors favor the trial court's conclusion that the instant contract was predominantly for the sale of goods. Accordingly, we conclude that the trial court did not err in applying UCC Article 2 to this transaction.

## II. Breach on the Part of AVA

In his second issue, Mr. Tanzer argues that the trial court erred in not declaring AVA's failure to complete its work as a breach of the contract. In the trial of this action, AVA proved its basic claim, i.e., AVA invoiced Mr. Tanzer for $119,402.15, which constitutes $89,640.03 for equipment, $6,930 for miscellaneous parts and wiring, $13,260 in labor, and $9,930 in taxes. AVA further proved that Mr. Tanzer paid only $75,577.60, leaving a balance due of $43,824.55. The trial court determined that AVA had delivered and installed all of the equipment for which it had charged Mr. Tanzer, excluding certain items that the trial court found were improperly invoiced and for which Mr. Tanzer was entitled to credit. In addition, the trial court gave Mr. Tanzer offsets for the equipment that the court determined were rejected by Mr. Tanzer, i.e., the Escient music system and phone system.

In his brief, Mr. Tanzer articulates this issue as whether the trial court erred in not declaring a "breach" of contract on the part of AVA, thus precluding recovery. In essence, Mr. Tanzer asks this Court to apply common-law contract principles to some portions of the contract. The so-called "divisible rule," whereby those portions of a hybrid contract dealing with sale of goods were governed by the UCC, while portions addressing services were treated under common-law contract principles, was specifically rejected by the Tennessee Supreme Court in ***Hudson v. Town and Country True Value Hardware, Inc***.,666 S.W.2d 51 (Tenn. 1984). Accordingly, Tennessee follows the predominant purpose test, as discussed in detail above. Thereunder, if the court, by applying the ***Pass*** factors, determines that UCC Article 2 applies to the contract, then it applies to the whole of the contract. 67 Am. Jur. 2d <u>Sales</u> § 37. Having determined above that the predominant purpose of this contract is for the

sale of goods, any argument implicating common-law contract principles is inapplicable. The UCC governs. Therefore, the only proper issues before this Court, concerning the award of damages, are whether Mr. Tanzer had any valid defense to refuse payment, or whether he was entitled to any further offsets under the UCC.

It is well settled that, in the event that a seller tenders nonconforming goods, the UCC provides three options to the buyer: (1) rejection of the goods; (2) acceptance of the goods; or (3) acceptance of any commercial unit and rejection of the rest. Tenn. Code Ann. §47-6-601 ("[U]nless otherwise agreed. . .if the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may: (a) reject the whole; or (b) accept the whole; or (c) accept any commercial unit or units and reject the rest"); *see also, **Big Creek Landscaping, L.L.C. v. Hundson Constr. Co.***, No. M2006-01657-COA-R3-CV, 2007 WL 3072773 (Tenn. Ct. App. Oct. 22, 2007). "Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller." Tenn. Code Ann. §47-2-602(1). The buyer may revoke his or her earlier acceptance if, among other things: (1) the goods contain defects that substantially impair their value or reasonably undermine the buyer's confidence that they will perform the function for which they were purchased; (2) the defects were not known and would have been difficult for the buyer to discover; and (3) the revocation of acceptance occurs within a reasonable time after discovery of the defect and before any substantial change in the condition of the goods not caused by the defects. ***Patton v. McHone***, 822 S.W.2d 608, 618–19 (Tenn. Ct. App. 1991) (citing, *inter alia*, Tenn. Code Ann. §47-2-608).

In light of the foregoing principles, in this case, the trial court could have found that Mr. Tanzer rejected the goods, accepted the goods, or rejected some of the goods. As set out in its order, *supra*, the court determined that Mr. Tanzer accepted the majority of the goods that were delivered by AVA. Acceptance occurs when the buyer, after a reasonable opportunity to inspect the goods, signifies to the seller that the goods are conforming or that he or she will retain them in spite of their nonconformity, or fails to make an effective rejection, or does any act inconsistent with the seller's ownership. Tenn. Code Ann. §47-2-606. With the exception of those goods identified by the court's order as "rejected," there is no indication in the record that Mr. Tanzer effectively rejected any additional goods. Accordingly, under Tennessee Code Annotated Section 47-2-602, Mr. Tanzer is not entitled to the UCC remedies of cancellation of the contract, recovery of the price of the goods he did not reject, or "cover" and damages. Tenn. Code Ann. §§47-2-711 –712 (defining "cover" as the "reasonable purchase of or contract to purchase goods in substitution for those due from the seller."). A buyer must do some affirmative act in order to reject goods, and the default result of the buyer doing nothing is acceptance. *See, e.g., **Barton Brands, Ltd. v. O'Brien & Gere, Inc**.*, No. 3:07-CV-78-H, 2009 WL 2424345 (W.D. Ky. July 29, 2009) (distinguishing affirmative rejection from mere lack of acceptance).

According to our record, Mr. Tanzer submitted various "punch lists" to AVA, requesting repairs and adjustments. A "punch list" does not constitute a "seasonable notice of rejection" under Tennessee Code Annotated Section 47-2-602. Rather, a "punch list" is a request for some repair or change, which is, by its nature, the opposite of a notice of rejection, i.e., if someone requests a repair on something, there is strong indication that they do not intend to reject it, but are merely asking that the item receive additional work or attention.

It is also important to note that Mr. Tanzer actually retained all of the equipment, with the exception of those items that the court found were specifically rejected. In fact, Mr. Tanzer hired Marquis to perform maintenance on the goods installed by AVA, an "act inconsistent with the seller's ownership" under Tennessee Code Annotated Section 47-2-606 (c).

Once a buyer has accepted the goods, the UCC provides for only limited circumstances under which the buyer may revoke his or her earlier acceptance. For example, the buyer may revoke if nonconformity substantially impairs the value of the goods and if he or she accepted the goods on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured. Tenn. Code Ann. §47-2-608(a); *see also* ***Harry J. Whelchel Co., Inc. v. Ripley Tractor Co., Inc.***, 900 S.W.2d 691 (Tenn. Ct. App. 1995) (holding that buyer could not subsequently revoke acceptance where seller seasonably cured nonconformity). Under Tennessee Code Annotated Section 47-2-607(3)(a), a buyer who has accepted tender and discovers a breach must notify the seller of the nonconformity within a reasonable time. This provision "defeats bad faith on the buyer's part and protects sellers against noncurable and dubious, stale claims as to accepted goods." ***Duffy Tool & Stamping, Inc. v. Bosch Automotive Motor Systems Corp.***, No. M1997-00144-COA-R3-CV, 2000 WL 122225 (Tenn. Ct. App. Feb. 1, 2000). Accordingly, a seller, who receives timely notice that the goods are nonconforming, may inspect the goods pursuant to Tennessee Code Annotated Section 47-2-515, and then may either cure the defect or preserve evidence that no breach occurred. ***Id***.

We have reviewed the entire record in this case and conclude that the evidence does not preponderate against the trial court's finding that Mr. Tanzer rejected or revoked his acceptance only as to the phone system and the Escient music system. As to the remaining equipment, Mr. Tanzer did not revoke his acceptance of the equipment as evidenced by the fact that this equipment remained in his home at the time of trial. Accordingly, Mr. Tanzer is obligated to pay the contract price for the goods he accepted. Tenn. Code Ann. §47-2-607(1).

Furthermore, Mr. Tanzer's remedies are limited to those set forth in Tennessee Code Annotated Section 47-2-714, which requires proof of breach of warranty on the part of AVA,

(*see* discussion in Section III immediately below). *See also **Schroeder v. Barth***, 969 F.2d 421, 424 (7th Cir. 1992) (noting that recapture of the purchase price is not an available remedy under the UCC; recapture of purchase price is only appropriate when the buyer rejects goods or revokes acceptance); ***Barton Brands***, 2009 WL 2424345, at *10 (noting that rejection or revocation of acceptance is entirely inconsistent with breach of warranty); ***Baker v. Wade***, 949 S.W.2d 199, 201 (Mo. Ct. App. 1997) (holding that damages for breach of warranty and remedies for rejection or revocation of acceptance are "mutually exclusive"). Contrary to the argument advanced by Mr. Tanzer in his brief, the UCC does not contemplate that a general breach on the part of the seller would fully preclude the seller's action on the price; rather, the buyer must prove his or her setoff damages, if any, under the pertinent sections of the UCC, by proving rejection or revocation of acceptance or breach of warranty.

### III.  Calculation of Damages and Setoffs

As noted in Section II of this Opinion, Mr. Tanzer is not entitled to damages based upon recovery of the price of the goods, nor is he entitled to remedies available under Tennessee Code Annotated Section 47-2-711 for goods on which he neither revoked his acceptance, nor specifically rejected within a reasonable time frame.  Rather, any damages for accepted goods is limited to breach of warranty.  Tenn. Code Ann. §47-2-714.  This section of the code provides that, "[w]here the buyer has accepted goods and given notification [of nonconformity] he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable."  Tenn. Code Ann. §47-2-714(1).  The statute goes on to state that "[t]he measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted."  Tenn. Code Ann. §47-2-714(2).  We have reviewed the record and find no evidence therein concerning the difference in value so as to support damages for breach of warranty.

In addition to the foregoing damages, courts have also found that the cost of repair, in some circumstances, is an appropriate measure of damages for breach of warranty under Tennessee Code Annotated Section 47-2-714. *See, e.g., **Watson & Son Landscaping v. Power Equip. Co.***, No. W2002-00136-COA-R3-CV, 2003 WL 22326967, at *12 n.3 (Tenn. Ct. App. April 29, 2003), *perm. app. denied* (Tenn. Nov. 3, 2003) ("A common objective measurement of the difference in value as is and as warranted is the cost of repair or replacement.") (citation omitted).  Tennessee Code Annotated Section 24-5-114 provides, in relevant part, that:

> (a) Proof that bills were incurred and paid to repair real or
> personal property shall create a rebuttable presumption of the

reasonableness of the amount paid and the necessity for the repairs in any civil action seeking damages for injury to, or improper repair, of the property.

(b) This presumption shall not extend to any payments which exceed the sum total of one thousand dollars ($1,000). The plaintiff may select those payments, not exceeding one thousand dollars ($1,000), for which the plaintiff wishes to claim the benefit of the presumption.

*Id*. Accordingly, there is a rebuttable presumption of reasonableness and necessity for repair bills of $1,000 or less. However, for repair bills of greater than $1,000, the reasonableness and necessity of such repairs must be proven by competent evidence. Mr. Tanzer claims that the necessary repairs, which were done by Marquis, totaled $67,587. In support of this claim, and as an offer of proof to establish, among other things, breach of warranty damages as represented by costs of repair, Mr. Tanzer offered the testimony of Tom Brown, a Marquis employee, as an expert witness.[2] The record indicates that, after Mr. Tanzer's home was struck for the second time by lightning, which indisputably damaged several components of the "smart home" system, he hired Marquis not only to repair the programming (that was initially done by AVA), but also to upgrade the system by, among other things, adding video distribution. From Mr. Brown's testimony, it is apparent that the cost of the upgrades to the system were commingled with alleged costs of "repairs" to the system. There was also testimony from Mr. Brown to indicate that the damages from the second lightning strike were also commingled with other "repairs" and "upgrades." Although offered to show "cover" damages, Mr. Brown's testimony is not probative in that regard. Rather, his testimony, when taken as a whole, is only beneficial to the extent that it shows what particular work was done by Marquis and what amounts were invoiced by the company. However, Mr. Brown's testimony does not provide any real evidence concerning whether Mr. Tanzer is entitled to compensation from AVA for work performed by Marquis. Moreover, Mr. Brown's testimony is not sufficient to establish a breach of warranty on the party of AVA. At no point in the record does Mr. Brown give any opinion (even if we allow, *arguendo*, that he could give opinion testimony) as to the reasonable and necessary repair charges for **nonconforming** goods. In light of the fact that it is difficult, if not impossible, to sort out

[2] Mr. Brown was initially proferred as an expert for the purpose of showing flaws in AVA's design and installation. However, he was deemed not to be an expert in "electrical matters." Because most of the work performed at the Tanzer home was not, in fact, done by Mr. Brown, the court ultimately limited his testimony to "what he found" and/or "anything that he observed." The court excluded Mr. Brown's expert report from evidence, and stated that Mr. Brown was "just another fact witness." No appeal is taken as to the trial court's rejection of Mr. Brown as an expert, or as to the parameters the trial court set on Mr. Brown's testimony.

those of Marquis's charges, if any, that pertain to repair of nonconforming goods sold by AVA and accepted by Tanzer from those charges pertaining to upgrades and additions to the system, we cannot conclude that the evidence preponderates against the trial court's finding concerning "cover" damages.

In addition to the foregoing, in some cases, a buyer may recover certain incidental or consequential damages that flow from nonconforming accepted goods. Tenn. Code Ann. §47-2-714(3). Incidental damages include, but are not limited to, "any commercially reasonable charges, expense or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach." Tenn. Code Ann. §47-2-715(1). Consequential damages include, but are not limited to, "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." Tenn. Code Ann. §47-2-715(2)(a). "If direct out-of-pocket expense is incurred by a party as a direct and proximate result of a breach of contract, that expense, if within the contemplation of the parties, is a consequential damage." *First Tennessee Bank Nat'l Ass'n v. Hurd Lock & Mfg. Co*, 816 S.W.2d 38, 43 (Tenn. Ct. App. 1991).

In this case, the trial court declined to award Mr. Tanzer consequential damages for the amounts paid to Marquis following the second lightning strike. In doing so, the trial court noted that it had already allowed offsets for the items that had been rejected. The court also noted that Marquis made upgrades and changes to the whole system such that it would be difficult to determine which, if any, of the amounts paid to Marquis flowed from nonconformity of goods accepted from AVA. Upon review of the record, we cannot conclude that the evidence preponderates against this finding. As discussed above, Mr. Brown's testimony was insufficient to establish a breach of warranty. This proof is also deficient in terms of supporting a finding that consequential damages are warranted and, if so, in what amounts. As noted by the trial court, it is difficult, if not impossible, from the evidence offered by Mr. Tanzer to determine which of Marquis's costs flowed from nonconforming items. In his appellate brief, Mr. Tanzer relies upon the case of *Edenfield v. Woodlawn Manor, Inc.*, 462 S.W.2d 237 (Tenn. Ct. App. 1970). His reliance on this particular case is, however, misplaced. *Edenfield* involved a contract for construction of a condominium and did not implicate any sale of goods. As discussed in detail above, the instant case does not involve a construction contract. Accordingly, the only law applicable is Article 2 of the UCC, which provides only for the specific remedies discussed above.

In summation, and based upon our review of the entire record, we conclude that Mr. Tanzer did not offer sufficient evidence to show the difference in value between the goods as accepted and the goods as warranted. Mr. Brown's testimony was not competent concerning the reasonableness or necessity of costs of repair of nonconforming goods, and

also did not support an award of consequential damages. Moreover, Mr. Tanzer did not prove consequential damages in that he was unable to show that the charges invoiced by Marquis were a direct and proximate result of uncured nonconformity of any goods sold by AVA. From the totality of the circumstance, we conclude that the trial court correctly calculated the type and amount of damages, offsets, and credits under the UCC.

## IV. Tennessee Consumer Protection Act

The Tennessee Consumer Protection Act, Tennessee Code Annotated Sections 47-18-101, *et seq.* ("TCPA"), prohibits, among other things, "unfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code Ann. §47-18-104(a). The TCPA enumerates certain acts as unfair or deceptive practices; as is relevant to the instant appeal, these acts or practices include: (1) "[r]epresenting . . . that a person has a sponsorship approval, status, affiliation or connection that such person does not have," Tenn. Code Ann. §47-18-104(b)(5); and (2) "[r]epresenting that goods are original or new if they are deteriorated, altered to the point of decreasing value, reconditioned, reclaimed, used or secondhand," Tenn. Code Ann. §47-18-104(b)(6). A "deceptive" act or practice is "one that causes or tends to cause a consumer to believe what is false or that misleads or tends to mislead a consumer as a matter of fact." ***Tucker v. Sierra Builders***, 180 S.W.3d 109, 116 (Tenn. Ct. App. 2005) (citations omitted). An act or practice may be deemed unfair if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." ***Id***. at 116–17 (citing 15 U.S.C. §45(n)). Because the TCPA is remedial, courts have determined that it should be construed liberally in order to protect the consumer. ***Id***. at 115. In order to recover under the TCPA, a plaintiff must prove: (1) that the defendant engaged in an unfair or deceptive act; and (2) that the defendant's conduct caused an "ascertainable loss of money or property . . . ." ***Id***. (quoting Tenn. Code Ann. §47-18-109(a)(1)); *see also* ***Cloud Nine, L.L.C. v. Whaley***, 650 F. Supp. 2d 789, 798 (E.D. Tenn. 2009) ("plaintiffs asserting claims under the [TCPA] are required to show that the defendant's wrongful conduct proximately caused their injury). The statute of limitations governing private actions brought under the TCPA is one year from the date of discovery of the unlawful act or practice, with a statute of repose of five years from the date of the transaction. Tenn. Code Ann. §47-18-110.

Whether a particular representation or act is "unfair" or "deceptive," within the meaning of the TCPA, is a question of fact, ***Id***. at 116 (citation omitted), which we review *de novo* upon the record with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). Furthermore, when the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge who has had the opportunity to observe the witnesses and their manner and demeanor while testifying is in

a far better position than this Court to decide those issues. *See **McCaleb v. Saturn Corp**.*, 910 S.W.2d 412, 415 (Tenn. 1995); ***Whitaker v. Whitaker***, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness' testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *See id*.; *see also **Walton v. Young***, 950 S.W.2d 956, 959 (Tenn. 1997).

The trial court found insufficient evidence to sustain Mr. Tanzer's claim under the TCPA. In fact, Mr. Tanzer's counter-complaint is somewhat vague as to what particular deceptive or unlawful acts or practices AVA may have engaged in. Accordingly, in the first instance, we note that allegations of the fraudulent or deceptive acts, giving rise to the TCPA claim, must be pled with particularity. ***Humphries v. West End Terrace, Inc.***, 795 S.W.2d 128, 132 (Tenn ct. App. 1990) (citing Tenn. R. Civ. P. 9.02). Although Mr. Tanzer should have been more specific in his pleadings, he has sufficiently briefed the following allegations in support of his TCPA claim: (1) that AVA allegedly sold Mr. Tanzer a "demo-model" JVC projector that is misrepresented as new; (2) that AVA misrepresented Chris Rogers's education and qualifications; (3) that AVA misrepresented the quality of services they could provide; (4) that AVA misrepresented the quality of goods installed; and (5) that AVA engaged in deceptive billing practices. The trial court specifically addressed the first two allegations in its preliminary, post-trial findings, *supra*. The court found no proof that AVA made misrepresentations as to the projector. We have reviewed the record, and agree with the trial court's assessment. The record shows that Mr. Tanzer picked the projector up at AVA's showroom, and that he received a $2,000 discount on the final invoice. The court further found that Mr. Tanzer's own testimony as to representation of Mr. Rogers's qualifications as an "electrical engineer," were insufficient to sustain his burden. We have reviewed this testimony and conclude that Mr. Rogers represented only that he had "an engineering background," which appears to be true based upon the fact that Mr. Rogers holds two degrees in engineering. Although the trial court did not specifically address Mr. Tanzer's third and fourth allegations, *supra*, concerning the quality of services and goods, and the allegedly deceptive billing practice, from the court's conclusion that "there is no legal basis for a consumer protection act claim regarding this sale," it is clear that the court was not persuaded on these grounds. After review of the record, we reach the same conclusion.

Concerning the allegation that AVA misrepresented the quality of services it could provide by telling Mr. Tanzer that they had the skill and ability to complete the work, Mr. Tanzer has not shown that these statements were false. Although certain problems arose with Mr. Tanzer's "smart home" system, it is not disputed that AVA substantially performed all of the contemplated work, including those items on Mr. Tanzer's "punch list." To prevail on this ground, Mr. Tanzer would have to show that AVA performed in an unworkmanlike manner. Usually, such a finding would be based upon expert testimony concerning the professional standard of care and corresponding breach. *See, e.g., **Hopper v. Moling***, Hopper

v. Moling, No. W2004-02410-COA-R3-CV, 2005 WL 2077650 (Tenn. Ct. App. Aug. 26, 2005) (upholding the trial court's finding of constructive fraud for performance of a contract in unworkmanlike manner based upon expert testimony on the appropriate professional standard and breach). We have previously discussed the shortcomings in Mr. Brown's testimony. From the totality of his statements, and from the record as a whole, we cannot conclude that Mr. Tanzer has met his burden to show that AVA performed in an unworkmanlike manner.

Concerning the allegation that AVA misrepresented the quality of certain goods, including the NEC phone system and the Escient system (both of which the trial court deemed to be rejected goods), Mr. Tanzer alleges that AVA's statement that these items were "superior" was a clear misrepresentation. We respectfully disagree. Assuming, *arguendo*, that AVA did make the statement that these items were "superior," such statements would likely constitute "puffing." As explained by this Court, in ***Ladd v. Honda Motor Co., Ltd.***, 939 S.W.2d 83 (Tenn. Ct. App. 1996), "puffing" is a statement that embodies "exaggeration[], the truth or falsity of which cannot be determined easily, that amount[s] to no more than an expression of the seller's opinion about the character or quality of the produce." ***Id.*** at 100; *see also* ***LensCrafters, Inc. v. Vision World, Inc.***, 931 F. Supp. 1462, 1469 (D. Minn. 1996) (holding that the characterization of "vastly superior" was nothing more than puffery, which did not support a claim under the Lanham Act). In the instant case, and as noted above, the trial court did not find any violation of the TCPA based upon the misrepresentation of the quality of goods. Inferentially, then, the Chancellor either found that Mr. Tanzer did not carry his burden to show that AVA made a false statement, or his burden to show that AVA's statements that the items were "superior" was anything other than puffing. The record does not preponderate against either of these findings.

Finally, Mr. Tanzer argues that there were certain invoicing disputes. Mr. Tanzer asserts that these alleged disputes constitute deceptive billing on the part of AVA. From the record, there is simply a lack of proof that any of the alleged invoicing errors were unfair or deceptive as those terms are defined by the TCPA, *see supra*. In other words, the proof does not show that any invoicing errors constituted a practice that caused or tended to cause Mr. Tanzer to believe something false, or that the errors misled or tended to mislead him as to a factual matter. While we concede that the trial court did find some discrepancies in the invoicing, the court did not find that these mistakes caused Mr. Tanzer any substantial injury. Accordingly, the court resolved the discrepancies by awarding Mr. Tanzer $1,930 in setoffs and credits. From the totality of the circumstances, we cannot conclude that the evidence preponderates against the trial court's conclusion that setoffs and credits in favor of Mr. Tanzer cured the mistakes in the billing, nor does the evidence preponderate against the trial court's conclusion that these mistakes failed to rise to the level of deception so as to implicate the TCPA.

For the foregoing reasons, we affirm the judgment of the trial court. The case is remanded for all further proceedings as may be necessary and are consistent with this opinion. Costs of this appeal are assessed against the Appellant, Stephen Tanzer, and his surety.

_____
J. STEVEN STAFFORD, JUDGE