**David Camara v. Bedford W. Hill, d/b/a B. W. Hill Systems**

[596 A.2d 349]

No. 90-197

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed July 5, 1991

*Edward L. Winpenny* of *DeBonis, Wright & Winpenny, P.C.*, Poultney, for Plaintiff-Appellant.

*S. Scott Smith* of *Biederman & Rakow, P.C.*, Rutland, for Defendant-Appellee.

**Johnson, J.** Plaintiff sued defendant seeking recovery of amounts paid to defendant for a computer system for plaintiff's slate business, consequential damages, and attorney's fees. Defendant counterclaimed for the value of time spent developing software. After a two-day bench trial, judgment was entered for defendant on plaintiff's claim and for plaintiff on the counterclaim; plaintiff appealed. We affirm in part and reverse in part and remand for further proceedings.

Defendant submitted an initial proposal to plaintiff on July 27, 1988, stating as follows:

Dear Dave [Plaintiff],

This is a breakdown of the computer system we have been discussing. Most of the vendors that I have talked to have told me that shipping times are about one week. I'll

have this stuff shipped to me and I'll burn it in, (test run it) and write the inventory control software before I move the system to your office. If they're not as bad a bunch of liars as the slate people, I should have Gail [plaintiff's employee] driving you crazy with the thing, in about three weeks.

The letter then specified a CCDA 640 kilobyte memory computer for $1,971 and an "I.coth [sic] Starwriter" printer for $948. Promised software included a "BPI Accounting Package" for $450, a "dBase III plus database" for $649, a WordPerfect word-processing program for $375, and an operating system program for $139. The proposal also included miscellaneous charges of $250, for a grand total of $4,782.

Plaintiff agreed to the proposal and paid $4,782 when defendant told him that the equipment had been shipped. In subsequently delivering system components, defendant changed many of the specifications in the July 27, 1988 letter, and the ensuing lawsuit largely concerned whether or not plaintiff had approved those changes. The trial court found that plaintiff approved a different computer with a somewhat smaller memory, since the one recited in the July 27, 1988 letter was then in short supply. Instead of a 42-megabyte hard drive, defendant supplied a 30-megabyte drive, which the court found "was entirely adequate for the system." The court further found that defendant supplied a printer "which was identical to the Starwriter except for the nameplate on the machine." Instead of the BPI accounting program, defendant supplied a DAK brand substitute, because he concluded the latter "would be more appropriate to the Plaintiff's needs." It is also undisputed that defendant provided plaintiff with nonoriginal copies of the database and word-processing programs described in the July 27, 1988 letter.

Central to the suit were delays in both the shipment of additional components and the completion of software customized for plaintiff's business use. On October 19, 1988, a computer was delivered to plaintiff, at which time, according to defendant's testimony, the software was "probably 25% complete." On November 23, 1988, defendant installed the accounting program, but the inventory software remained uncompleted, and as far as the record indicates, was never completed. The printer

was delivered on January 17, 1989, but the tractor feed, essential to plaintiff's payroll, was delivered a year later.

In February, 1989, plaintiff demanded return of the money paid to defendant, but did not offer to return the equipment. When asked why he did not return the system, plaintiff testified:

Q. Have you held onto the equipment?

A. Why I really don't know. I had gotten a thousand dollars into it and I have got a lot of time. I guess that's why I held onto it.

The court found that while the computer was in plaintiff's possession, the hard disk was reformatted and the system was used. The trial court also found that there were delays in the performance of defendant's undertakings, but it attributed some of these delays to plaintiff's own lack of cooperation, specifically his failure to make his accountant available to consult with defendant to aid in designing an accounting system appropriate for plaintiff's business.

The court concluded that time was not of the essence in the performance of the contract and that plaintiff "has received substantially the system contemplated by the parties, and the Defendant has received the sum set forth in [the July 27, 1988 letter], which he drafted." The present appeal followed.

Plaintiff argues first that he rejected the entire system as nonconforming goods, pursuant to the Uniform Commercial Code (UCC), specifically 9A V.S.A. § 2—601(a). Defendant responds that the UCC does not apply to this transaction because "[t]he actual physical goods were entirely secondary to Plaintiff." But the trial court made no determination that the agreement between the parties was predominantly one for services, rather than goods, and the record strongly supports the opposite conclusion. The prices set by defendant in the July 27, 1988 letter all related to goods, not services. See *Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737, 742 (2d Cir. 1979) (where essence of contract for computer system involved sales, rather than services, the UCC applied); *Austin's of Monroe, Inc. v. Brown*, 474 So. 2d 1383, 1388 (La. App. 1985) (contract, which had as its predominant objective the obligation to deliver an operational computer system, was one for sale); cf. *Liberty*

*Financial Management Corp. v. Beneficial Data Processing Corp.*, 670 S.W.2d 40, 49 (Mo. App. 1984) (contract to put data on tapes for transfer to data processing system was contract for services, not the sale of tapes). While the counterclaim asserted that there was at least a quasi-contract to compensate defendant for programming services, there was little if any support for that claim in the record, and the trial court, in any case, denied the counterclaim. In sum, the UCC applies to this transaction.

■■ Defendant argues that under the UCC there was no valid rejection or revocation of acceptance by plaintiff, and we agree that the trial court's findings and conclusions as to the hardware, though not articulated in UCC terms, are consistent with defendant's position and are not clearly erroneous. Under 9A V.S.A. § 2—606(1)(a) acceptance of goods may occur when the buyer "[a]fter a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity . . . ." The court found that plaintiff agreed to the substitution of another computer for the one described in the July 1988 letter and that the printer delivered was identical to the one promised, though marketed with the name of another company. By agreeing to the substitution of a different computer for the one promised, plaintiff waived his right to reject that component. And assuming, arguendo, that plaintiff could have rejected the printer delivered as not conforming to the contract, he did not do so. He demanded return of his money about a month after the printer was delivered, but that demand related to delays in putting a complete system on line, delays which the trial court found were specifically attributable to plaintiff's conduct.

■ Plaintiff argues that even if he accepted the system under the UCC, he later revoked acceptance pursuant to 9A V.S.A. § 2—608. A buyer may revoke his or her acceptance of a nonconforming commercial unit if he or she has accepted it either "on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured," 9A V.S.A. § 2—608(1)(a), or "without discovery of such non-con-

formity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances." 9A V.S.A. § 2—608(1)(b). The trial court concluded that plaintiff knew of the nonconformities in the hardware at the time he accepted the system. The findings do not reflect discovery of any additional, post-delivery nonconformities, and the record does not suggest that there were reasons for revoking acceptance uncovered after plaintiff demanded the return of his money in February, 1989. In any case, plaintiff would have had to notify defendant that his acceptance was revoked pursuant to § 2—608(2), and he did not do so. See *Desilets Granite Co. v. Stone Equalizer Corp.*, 133 Vt. 372, 374, 340 A.2d 65, 67 (1975).

█ Plaintiff next argues that he did not receive original copies of dBase III or WordPerfect. Uncontradicted testimony at trial confirms that assertion, and it is not contradicted by defendant on appeal. The trial court made no findings on this issue, though the issue was clearly presented in the complaint and at trial. Under 9A V.S.A. § 2—312(1)(a) defendant warranted that "the title conveyed shall be good, and its transfer rightful." As to the two nonoriginal programs supplied, this warranty was violated, and to the extent of plaintiff's consequent loss he did not receive "substantially the system contemplated by the parties."

We must therefore reverse and remand for further proceedings to determine the damages resulting from defendant's failure to supply the promised programs and to fashion an appropriate remedy. The decision is affirmed in all other respects.

*Reversed and remanded for further proceedings and an amended order with respect to the computer programs described in this opinion; otherwise affirmed.*