FILED
05/21/2018
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 17, 2018 Session

## WILLARD P. WAGNER, ET AL. v. ERIC MARTIN NOVELLI

**Appeal from the Circuit Court for Hamilton County**
**No. 14C1262     W. Neil Thomas, III, Judge**

_____

### No. E2017-01183-COA-R3-CV

_____

This appeal concerns a dispute over an agreement to install a heating and air conditioning system ("HVAC") in a house. Eric Martin Novelli ("Novelli") engaged Willard P. Wagner d/b/a Wagner Heating & Air ("Wagner") to install an HVAC system at Novelli's house. There was no written contract. Novelli grew dissatisfied with Wagner's work and dismissed him from the project. Wagner sued Novelli in the Circuit Court for Hamilton County ("the Trial Court") for payment on the project. Novelli filed an answer and counterclaim. Novelli alleged, among other things, that the units Wagner installed were too large which created problems. After a trial, the Trial Court found that it could not find any breach of contract with respect to installation. Instead, the Trial Court applied the Uniform Commercial Code ("UCC") and awarded Wagner $11,400 for payment on the project. Novelli appeals to this Court. We find, as did the Trial Court, that Wagner in sizing the units relied on specifications Novelli gave him, installed the HVAC per their agreement using merchantable, fit for purpose units, and is entitled to judgment as awarded by the Trial Court. We affirm the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which RICHARD H. DINKINS and THOMAS R. FRIERSON, II, JJ., joined.

Timothy M. Gibbons and Logan Threadgill, Chattanooga, Tennessee, for the appellant, Eric Martin Novelli.

William G. Schwall, Chickamauga, Georgia, for the appellee, Willard P. Wagner d/b/a Wagner Heating & Air.

# OPINION

## Background

In 2013, Novelli sought to install an HVAC system in his three level house. The house did not belong to Novelli personally, but rather belonged to a trust established by Novelli's father of which Novelli was trustee. To install the HVAC system, Novelli hired Wagner. No written agreement exists between the parties. The parties, who disagree on almost everything, agree that Wagner was to install the HVAC system for Novelli. Both Novelli and Wagner are experienced builders.

Novelli was highly critical of Wagner's work. Novelli cites numerous claimed flaws, one of which is that Wagner allegedly overestimated the necessary cooling capacity. According to Novelli, this excessive cooling capacity caused the HVAC to malfunction. For his part, Wagner contends that he merely acted on computations he made to size the units based upon information supplied by Novelli. Novelli sent Wagner an email telling him his work on the project was complete and not to return.

In October 2014, Wagner sued Novelli in the Trial Court. Wagner alleged that Novelli owed him $14,100. Wagner also asserted mechanic's and materialman's lien. In June 2015, Novelli filed an answer and counterclaim alleging that Wagner's work was inadequate and that Novelli spent $18,850 to repair Wagner's deficient work.

This case was tried on August 9 and November 8-9, 2016. Wagner testified in part regarding his working relationship with Novelli and what he understood their agreement to be:

Q. We really need to get specific. Specifically, what was your agreement with Mr. Novelli?
A. To install heating and air in his house in Thunder Farms.
Q. Did you go further and talk about what needed to be done to do that?
A. Yes.
Q. And what exactly did you discuss?
A. Equipment size, location -- this is over several different meetings -- generally just where to put the equipment, what he wanted as far as gas appliances, you know, things like that.

***

Q. Did you ever ask Mr. Novelli for a punch list?
A. Yes.

Q. And what did he say?
A. He just kept saying he would have me something, and he never did.
Q. Was that a constant problem you had?
A. Yes.
Q. Let's get back -- how often were you actually on this project?
A. I was there -- for every five days, I was there at least three days of those five. I had to go do service calls and look at other jobs; so I couldn't be there all the time, but I was there quite a bit.
Q. How often did you talk to Mr. Novelli?
A. Every day I was there. He wasn't there every day, but he was there quite a bit, and I talked to him every day.
Q. Were those pleasant conversations?
A. Only that I was a poor planner and I couldn't do anything right. That's about -- you know, a lot of times, we would actually discuss relevant things and get things placed where they should be.

Novelli, detailing his own account of his dealings with Wagner, testified in part:

Q. Did you have discussion with Mr. Wagner about the HVAC units that would be installed in the house?
A. No, other than the brand of it.
Q. And what brand did you ask for?
A. I asked for Rheem.
Q. R-H-E-E-M?
A. That's correct.
Q. Did you tell Mr. Wagner how many units you wanted?
A. Actually, when we first discussed this project, I wanted to run two units. But he told me that was against Hamilton County code; you had to have one unit per floor of living space. I had built other houses in Georgia and Alabama where we used two, because, essentially, these type houses have a high roof, and you have a bonus room that's not always utilized; so it seems kind of excessive to run an air-conditioning system for a room that gets used occasionally. But when he told me I had to have three, I just accepted what he said, not being familiar with Hamilton County.
Q. Did you ever tell Mr. Wagner the tonnage of cooling load to plan for?
A. No. I have no idea how much cooling is required on a house, even though I build houses.
Q. Before this house, had you ever seen these calculations of cooling and heating loads?
A. I'd never seen a Manual J before.
Q. Did Mr. Wagner ever show you his Manual J calculation?

A. I saw it for the first time when it was faxed over, and you handed me a copy of it.

Continuing his testimony on cross-examination, Novelli stated:

Q. You didn't have a written contract with him, did you?
A. I didn't.
Q. You didn't have any timetable written, did you?
A. Selling my house and the amount of time Mr. Wagner spent there and all the other subcontractors and all the other work being completed except for the air-conditioning, I think it's apparent that there's -- you know, you at least have to be in front of the guy beside you, as far as progression goes. You can't be the last man there, and that's what Mr. Wagner was.

***

Q. I see. So you're now saying that mold was not caused by flooding. It was caused by what?
A. The oversized air-conditioning units.
Q. Don't they tend to dry out the house rather than to put too much humidity in the house?
A. Mr. Schwall, you have discussed this in such great lengths. Okay? We've already talked about this, hours, about what happens if the units are too large. They cycle off and on; therefore, they don't remove the moisture. There's moisture between you and me right now, suspended in the air. It's not on the floor from a flood. But if you pour water on the floor, that's in addition to the moisture that's between us. So with the units not removing moisture from the air, that is what caused the mold.
Q. So you're now alleging that the mold was caused by the oversized units and not the flooding or in addition to flooding?
A. In addition to, that's correct.

Dan Clark, an HVAC contractor who worked on the HVAC for Novelli following Wagner's dismissal, testified in part:

Q. Did Mr. Novelli contact you and ask you the come [sic] look at the HVAC system in his house?
A. Yes.
Q. Is his house out at Thunder Farms?
A. Thunder Farms.
Q. And when you came out there, was the HVAC system already installed?

-4-

A. Yes.

Q. Was it working properly?

A. No.

Q. What was the problem? Why was it not working properly?

A. The main unit for the main floor, the fan board had gone out due to water corrosion -- corrosion from water in the air-handler.

***

Q. Did you have to replace any units out there?

A. We replaced the 5-ton with, I believe, a 3 and a half ton, outdoor section only, and an expansion valve.

Q. All right. Now, you say "outdoor only" -- by the way, how did you know -- well, let me ask the question this way. Was the 5-ton unit -- the 5-ton-cooling-rated unit necessary for the main level of the house?

A. No. It was too large.

Q. It was too large?

A. Yes.

Q. What happens when you get a --

A. Well, if your unit doesn't run long enough -- if shuts off and on, off and on -- it'll have a tendency to short-cycle. And if the unit's not running long enough, it's not pulling enough moisture out of the air, and then you have a cold, clammy feeling in your house. Back years ago, you'd walk in, and if the place felt cold, it always felt clammy. Today's systems are not supposed to be feeling clammy. We allow them to run longer, and that way we suck more of the moisture out. We get a cooling effect, because we've lowered the humidity level, plus we have the AC also running to help in there. But we get rid of that cold, clammy filing [sic]. Plus, with the cold, clammy feeling, you have moisture on the walls, which then eventually will turn into mold.

Q. And so you replaced the unit -- the outside unit for the main level of the house, and if I understand correctly, you changed it out from a 5-ton unit to -- what? -- 3 and a half?

A. I believe it was 3 and a half.

On cross-examination, Clark testified:

Q. A lot of what you're saying is something you would have done differently than Mr. Wagner did, correct?

A. I wouldn't have put a 5-ton unit in when a 3 or a 3 and a half would have done the job.

-5-

Q. You put in what your computer told you to put in, correct?
A. That's what the state requires, yes.
Q. And Mr. Wagner put in what his computer program told him to put?
A. Okay. I'm not arguing.
Q. So it's nothing wrong. It's just a computer difference.
A. Is it a computer difference, or is it a program difference? Is it measuring all three levels? I don't know.
Q. And you haven't actually read Mr. Wagner's --
A. I glanced at it.
Q. You glanced?
A. I saw it had 2-by-4 walls and the insulation -- I never saw anything about foam insulation in his either. I didn't -- I don't make a study of it. I mean, I'm a worker. That's where I'm at right now. I'm working. I'm not working here. I'm supposed to be somewhere else.

In April 2017, the Trial Court entered a detailed memorandum and order in which it determined, after analyzing the transaction under the UCC, that Wagner was entitled to a monetary judgment. However, the Trial Court found against Wagner with respect to his asserted lien, an issue Wagner does not appeal. The Trial Court found and held, in part, as follows:

The complaint in this action alleges a contract between Plaintiff, Willard Wagner, d/b/a Wagner Heating & Air (hereinafter "Wagner") and Eric Martin Novelli (hereinafter "Novelli") concerning improvements at . . . Ooltewah, Tennessee. The complaint alleges that the contract was commenced on September 19, 2013 and continued until July 19, 2014 (Compl. ¶2). It alleges that Novelli, as the owner of the property, engaged Wagner to provide heating and air conditioning for the residence. Although the complaint and counterclaim in this suit alleges the existence of a contract, no written contract was signed, and the complaint alleges that Novelli refused to sign a contract and work order provided by Wagner during the performance of the contract. (Compl. ¶ 6.) Thus, there is no writing in this case which evidences the terms of any contract between the parties, but the complaint alleges that Wagner provided equipment for and improvements for the real estate and filed a notice of lien in accordance therewith. (Compl. ¶7.) Wagner alleges that Novelli owes him $14,100 for the work performed, partial payment having been made during the work's performance.
On June 9, 2015, Novelli filed an answer and counterclaim, and in the counterclaim, he alleges that Wagner agreed to install a heating and air system and that he paid Wagner $7,600 for the work. Predictably, Novelli

-6-

alleges that Wagner's work was inadequate. As a result, he alleged he was required to incur substantial expense in the approximate amount of $18,850 to repair that inadequate work. For his cause of action, Novelli alleges Breach of Contract (First Cause of Action), Breach of Warranty (Second Cause of Action), Defective Construction (Third Cause of Action), Negligent Construction (Fourth Cause of Action), Exaggeration of Lien Claim (Fifth Cause of Action) and Money Had and Received (Sixth Cause of Action).

It was with these allegations that the trial commenced. As a result of that trial, the Court is faced with an unusual set of circumstances. First, although both parties allege the existence of a contract, the only term upon which they can agree was that Wagner was to supply to Novelli a heating and air conditioning unit for the house at . . . and that Wagner was to determine the size of that unit based upon facts supplied by Novelli. Second, the house in question was not owned by Novelli in his individual capacity but by a trust established under Novelli's father's Will of which he was trustee. The terms of the trust were not provided to the Court. Third, the lien filed by Wagner was filed against the property with Novelli, not the trust, given notice as the owner. Fourth, most of the evidence adduced at trial related alleged deficiencies in Wagner's work performed in installing the heat and air units. The only evidence which related to the goods supplied related to whether the capacity was appropriate. Fifth, neither party relied on the statute of frauds as a defense to the other's claim.

Although both parties alleged the existence of a contract, neither party showed any agreement upon the standards by which that contract was to be performed. The only "expert" testimony related to deficiencies in estimating the size of the heating and air units, not with respect to its installation. Although extensive lay testimony was received from Mr. Novelli regarding installation deficiencies, that testimony was either refuted, not supported by material evidence or related to conditions in existence after Wagner's work was performed, and he was dismissed from the job. Reliance is placed on the alleged failure of a duct blast test, but that failure was not shown to be the result defective ducting as opposed to its installation. Accordingly, the Court must rely upon the Uniform Commercial Code to resolve this conflict.

***

-7-

Findings of Fact

Willard Wagner is a heating and air conditioning contractor who has been in the residential construction business for 32 years. He has performed services at over 1,000 houses. He and Novelli met in the summer of 2013 and Novelli told him he wanted him to provide the heating and air conditioning for his home, which was a home with three floors. Novelli told him that he was working from plans he bought and that he was going to use fiberglass insulation in the basement and first floor with foam insulation on the third or upper floor. Because the R insulation rate for foam insulation is different from batt or fiberglass insulation, the tonnage requirements for the heat and air units will differ depending upon which insulation is chosen. Wagner made his calculations for the size of the units from computer programs which input various data such as house square footage, insulation and kind and location of windows. When Wagner started work on the house after he made his calculations, it had been roughed in and the plumbing had been installed but not the electricity. Based on his calculations and on what Novelli told him, he recommended a five ton unit on the main floor and a three ton unit in the basement. A two ton heat pump had already been decided upon for the upstairs. The main floor requirement showed a use for 51,065 BTU's which showed a five ton unit and the basement was 32,400 BTU's, which showed a three ton unit. The condensers for the outside units were based upon the sizing of the inside units and were coordinated with them. The rough-in work took six weeks, and Wagner was there every day except two or three days. There was a great deal of testimony about changes being made to the location of ducting and the machinery itself during the installation period, and the Court chooses to believe Mr. Wagner's version of those facts.

As mentioned above, the work on the heat and air conditioning for the house started in September, 2013, and after the initial discussions between Wagner and Novelli, Mr. Wagner began the manufacture of the ducting system in his shop. Certain modifications were necessary because Mr. Novelli opted for a truss design for flooring under the first floor. By October 25, all the vents and ducts were installed. Novelli was there for an inspection and did not object at that time to any of the work.

There was some discussion about the inspections made by the City of Chattanooga building inspector. Charles Edward Bennett, a building inspector for Hamilton County for 14 years, did the rough-in inspection and he inspected the ducts, returns and registers. He was there for 30 minutes and the system was not yet operating. He did not note any deficiencies in the heating and air conditioning system. The gas and mechanical system

passed inspection on October 25, 2013. He also inspected the system after it was operating and it passed inspection on June 1, 2014. He said he did not check the air flow but he did check the pans and pumps.

When Novelli came in two months later to the inspector's office with pictures and complained about his system, the property was re-inspected on September 16, 2014 by Tom Gibson, a senior building inspector, and the system did not pass. When he returned on December 17 and inspected again the system passed.

Wagner's next contact after his initial installation at rough-in was when he returned for trim-out eight to ten months later when Novelli asked him to trim-out. He said that when he gave Novelli a bill, Novelli wadded it up and threw it away. He said he should have been paid $9,000 but had only been paid $4,000. He did finally receive a check for $3,500.

Wagner said that he was never given a punch list by Novelli on final inspection, and at the time of that inspection he said Novelli did not say anything was wrong. Later, he was never given an opportunity to do any modifications to his work when Novelli did express displeasure and sent him a letter telling him not to come back to the job. Finally, he testified that Novelli owes him $12,000 based on the remaining payments on the basic job and for the trim.

Adam Reeves had been employed by Bill Wagner for 19 years. He said that he had installed about 100 units per year and knows the code. The significance of his testimony is that he said he recalls a discussion between Bill Wagner and Novelli where Novelli said that he was using fiberglass insulation, not foam, because he could not find someone to install foam at a reasonable rate. He also said that after he started installing the duct work that things began changing and that Eric Novelli wanted a lot of mechanical changes and that he had to tear out duct work two to three times. He said that Novelli was on the job every day and made location decisions even in disregard of possible code violations. He said that there had been nothing abnormal about the installation of the heat and air system in this house. He first noticed a problem between Novelli and Wagner when Wagner suddenly was not allowed back on the job after the last inspection. Finally, he said that the house did pass code.

Don Clark, a heat and air contractor for 24 years, examined the heat and air system at the request of Novelli. He said that it was already installed but there was a problem in that the main floor unit was not in operation because of water in the air handler. The problem was in the fan board, which sends signals to operate the system to the circuit board which is attached to the lower housing. He said that the system lets the homeowner know there is a problem. The problem, he said was that the

unit was in the drain pan not on it, which was improper, because it allows moisture in the unit. He said after he replaced the board, he put a 4 x 6 in to elevate the system from the drain pan. After that, the unit performed satisfactorily. He also performed a load calculation on the home. With respect to the third floor, he had to rebuild the return because the unit in the attic had dust and dirt because it was unconnected to the filter system. As a result, dirty air was being sucked into the unit. He said there was also a space where there was no duct at all to the return. These conditions he testified were in existence at the time he saw it, not when Mr. Wagner built it, and Mr. Wagner has denied these deficiencies.

Eric Novelli, a licensed general contractor with 20 years experience in residential and commercial construction, is the owner. He discussed tonnage with Wagner and the insulation to be used. He believed that foam was necessary for the top floor and possibly the main floor, but that batt would be appropriate for the basement. He never saw Wagner's calculations. With respect to the Chattanooga inspector having approved the house on inspection, he was shocked when the house passed inspection. He said the inspector was not there for five minutes for the rough-in inspection. He said that he told Wagner he could not believe that the house had passed inspection and told him to leave, but he said Wagner begged him to stay to be able to fix it because he said he needed the money. Novelli said that he gave in. He also said that he was not paying Wagner until it was completed and done correctly. To this, he testified, Wagner agreed. When the house finally passed inspection after he had objected, he could not believe it and called the inspector back out and told him he had missed a lot of major items. When he complained and performed a pressure test, the result was that a lot of air was lost. When inspected, Hamilton County rescinded the permit but it was finally passed.

With respect to the tonnage of the units, the main issue between the parties, Mr. Novelli testified that he relied upon Mr. Wagner's calculations. Although he was a general contractor, his work was generally in Alabama, and Alabama's calculations were different. Most of Mr. Novelli's testimony related to his complaints with Mr. Wagner's installation such as the location of ducts, the results of a duct blast test and the deficiencies shown in the notebook of bills marked as Exhibit 25. Much of this evidence was controverted by Mr. Wagner.

Conclusions of Law

The parties have testified, and the attorneys agree, that there is no written agreement, reflecting the intent of the parties as to their obligations

-10-

in connection with the supply of the air conditioning and heating units and ducting for this house and the standards applicable to the installation. Consequently, the Court is unable to make any findings with respect to any breach of contract with respect to installation. With respect to tonnage, the Court elects to give the most credibility to Mr. Clark. Accordingly, this case will be governed by the provisions of the Uniform Commercial Code, specifically the Implied Warranties of Merchantability and Fitness for Purpose. Under T.C.A. § 47-2-314, the Implied Warranty of Merchantability is defined as follows:

> (1) Unless excluded or modified, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value . . .
> (2) Goods to be merchantable must be at least such as:
>
> (a) pass without objection in the trade under the contract description; and
> (c) are fit for the ordinary purposes for which such goods are used.

The Implied Warranty for Fitness for Purpose is set forth in § 47-2-315, which reads as follows:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose . . .

Both of these provisions refer to a contract between the parties, which for the sale of goods, is defined in 47-2-201(1), as follows:

> (1) Except as otherwise provided in this section, a contract for sale of goods for the price of five hundred dollars ($500) or more is not enforceable by way of action or defense unless there is some writing or record sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing or record is not

insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing or record.

Neither party has asserted this defense. Thus, the Court believes this case must be determined by whether the goods provided satisfy the warranties of merchantability and fitness for the purpose intended. This case is somewhat similar to Fiddler's Inn, Inc. v. Andrew's Distributing Co., Inc., 612 S.W.2d 166 (Tenn. App. 1980). In that case, a motel operator ordered a series of air conditioning and heating units for his new motel, and after installation, complained that they did not heat properly and were noisy. The court considered the case under both the Implied Warranty Merchantability and the Implied Warranty and Fitness for Purpose. The Supreme Court held because the plaintiff thought he was purchasing air conditioning-heating units with a 4.5 kilowatt capacity and received heaters with only a 3.4 kilowatt capacity, the breach of warranty of Fitness for Purpose under § 2-315 was breached. The court declined to find a breach of the Warranty of Merchantability, since the "heating problems were caused by having heaters that were too small for plaintiff's method of operation and not necessarily because the heaters failed to perform to their capacity." (612 S.W.2d 166) The court also found no liability on the part of Carrier, and no breach of any implied warranty, because "Carrier simply sent the exact units which were ordered."

In this case, no contention is made that the units were not merchantable. The contention is that they were too large and not fit for their intended purpose. Mr. Wagner testified that he made his computations based upon information with respect to the type of insulation provided by Novelli, and this is confirmed by Dan Clark. He then used the computer program he always uses to make his capacity determination, and there was no testimony indicating that this computer program was in error. There is no question but that the system initially did not pass inspection because it was over capacity for the type of insulation actually used.

There is no dispute that the system now works fine. The Court cannot find that the units breached the Implied Warranty of Fitness for Use.

Because of the findings made herein, Mr. Wagner is entitled to payment for the remainder of his contract.

The Court has carefully reviewed the list of damages already incurred and the list of damages to be incurred by Novelli, but Novelli has failed to provide the necessary legal nexus between the breach with respect to sizing and those individual components of alleged damage. The only

-12-

possible items in the list of damages incurred which could relate to the sizing of the unit would be the water conditions alleged to have resulted by Novelli. These conditions, however, were not sufficiently shown to result from the sizing of the units and will not be awarded as damages.

In May 2017, the Trial Court entered its final judgment granting an award of $11,400 to Wagner. Novelli timely appealed to this Court.

## Discussion

Although not stated exactly as such, Novelli raises the following issues on appeal: 1) whether the Trial Court erred in failing to apply the "predominant factor" analysis to determine whether the parties' agreement to install a custom residential HVAC system predominantly was one for goods or services; 2) whether the Trial Court erred in applying the UCC instead of common law contract principles; 3) whether the Trial Court erred in failing to apply the common law of contracts; and, 4) whether the Trial Court failed to credit the testimony of Dan Clark, the witness it specifically found most credible with respect to tonnage of the HVAC units.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). A trial court's determinations regarding credibility are accorded deference by this Court. *Davis v. Liberty Mutual Ins. Co.*, 38 S.W.3d 560, 563 (Tenn. 2001). "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

We first address whether the Trial Court erred in failing to apply the "predominant factor" analysis to determine whether the parties' agreement, such as it was, to install a custom residential HVAC system predominantly was one for goods or services. In *Audio Visual Artistry v. Tanzer*, 403 S.W.3d 789, 799 (Tenn. Ct. App. 2012), this Court identified the following four factors in determining whether a contract is for a sale of goods such that the UCC applies: "(1) the language of the contract; (2) the nature of the business of the supplier of goods and services; (3) the reason the parties entered into the contract, and (4) the amounts paid for the rendition of the services and goods, respectively." We discussed further:

-13-

Accordingly, cases have held that the installation of the following are all sale of goods: (1) carpet, *Snyder v. Herbert Greenbaum & Associates, Inc.*, 38 Md. App. 144, 380 A.2d 618 (1977), *Colorado Carpet Installation, Inc. v. Palermo*, 668 P.2d 1384 (Colo. 1983); (2) electrical equipment, *E.C. Ernst, Inc. v. Manhattan Const. Co. of Texas*, 551 F.2d 1026 (5th Cir. 1977); (3) trees, shrubs and sod, *Burton v. Artery Co., Inc.*, 279 Md. 94, 367 A.2d 935 (1977); (4) steel lockers, *Anderson Const. Co., Inc. v. Lyon Metal Products, Inc.*, 370 So.2d 935 (Miss. 1979); (5) overhead doors, *Meyers v. Henderson Const. Co.*, 147 N.J. Super. 77, 370 A.2d 547 (1977); (6) water heaters, *Shapiro v. Long Island Lighting Co.*, 71 A.D.2d 671, 418 N.Y.S.2d 948 (1979); (7) a furnace, *O'Laughlin v. Minnesota Natural Gas Co.*, 253 N.W.2d 826 (Minn. 1977); (8) an air-conditioning system, *B & B Refrigeration & Air Conditioning Service, Inc. v. Haifley*, 1978 WL 23510 (D.C. Super. Ct. Nov. 6, 1978); and (9) interior window panels, *The Plantation Shutter Co. v. Ezell*, 328 S.C. 475, 492 S.E.2d 404 (1997).

\*\*\*

In light of the foregoing statutory provisions, the holding in *Glazer* is still applicable. Because the "prairie film" became "attached to the realty," such that it could not be removed "without material harm" to the structure, the Court correctly held that the contract was one for service, thus excluding application of the UCC. By contrast, in *Highland Rim Contractors v. Atlantic Software Corp.*, No. 01-A-01-9104CV00147, 1992 WL 184872 (Tenn. Ct. App. Aug. 5, 1992), this Court held that a contract involving the sale of a computer system to a construction company was a sale of goods contract. The Court noted that the contract was a hybrid contract, involving both sale of goods and service. The Court then applied the predominant purpose test to determine that the UCC applied to the transaction; in so holding, the Court stated:

> Other courts, using the predominant [purpose] test, have found that contracts for the sale of computer systems or related components, including hardware, software, training, and support services, are contracts for the sale of goods governed by Article 2. *RRX Indus., Inc. v. Lab–Con, Inc.*, 772 F.2d 543, 546 (9th Cir. 1985) (software, training, systems repairs, and upgrades); *Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737, 742-43 (2d Cir. 1979) (hardware and software); *Neilson Business Equip. Ctr., Inc. v. Monteleone*, 524 A.2d 1172, 1174 (Del. 1987) (computer

-14-

system); *USM Corp. v. Arthur D. Little Sys., Inc.*, 28 Mass. App. Ct. 108, 546 N.E.2d 888, 894 (1989) (computer system); *Communications Group, Inc. v. Warner Communications, Inc.*, 138 Misc.2d 80, 527 N.Y.S.2d 341, 344 (N.Y. Civ. Ct. 1988) (software); *Camara v. Hill*, 157 Vt. 156, 596 A.2d 349, 351 (1991) (computer system).

We agree with the reasoning of these precedents. Atlantic's agreement with Highland Rim was predominately for the sale of an integrated computer system. Its obligation to provide training in the use of the system was incidental to the purchase of the system itself. Accordingly, the transaction is one involving goods, and the parties' rights are governed by Article 2.

*Highland Rim Constructors*, 1992 WL 184872, at *6. We find the reasoning and cited cases in *Highland Rim* persuasive in the instant appeal. As set out in the contract, and in the incorporated proposal, it is clear that the contract contemplates the sale of various, moveable components, which were to be integrated via a control system. Unlike the *Glazer* case, the fact that the components were installed in the home did not result in an attachment that would change the movability of the goods sold. Accordingly, we are not persuaded by Mr. Tanzer's argument that the integration of the components constitutes a "construction" contract. The plain language of the contract simply does not support such a finding.

*Audio Visual Artistry*, 403 S.W.3d at 801-03.

Novelli argues that the Trial Court did not engage in a predominant purpose analysis before deciding that the UCC governed the transaction of the present case. The question then is whether this omission constitutes reversible error. While the Trial Court did not apply explicitly the predominant purpose test, the Trial Court's reasoning can be gleaned from its order. The Trial Court found plainly that the point of this agreement was for Wagner to install an HVAC system at Novelli's house, and that the service element was ancillary to the underlying purpose of the agreement which was to supply movable goods. We find no reversible error in the Trial Court's failure to conduct explicitly a predominant purpose analysis in its written order when its reasoning is consistent with a predominant purpose analysis and is discernable from the same order.

We next address whether the Trial Court erred in applying the UCC instead of common law contract principles. Novelli argues that this was no simple installation of

goods, pointing out that the rough-in took six weeks. According to Novelli, this transaction predominantly was one for services rather than goods. Wagner argues in response that the transaction primarily concerned goods rather than services because the goods at issue all were existing goods save for the fabricated trunk lines. The Trial Court's attempt to adjudicate this dispute was hampered by the lack of a written agreement or indeed any contractual terms relative to installation. The parties were the creators of this mess. As found by the Trial Court, "[a]lthough both parties alleged the existence of a contract, neither party showed any agreement upon the standards by which that contract was to be performed." It is clear that the Trial Court did what it could under the facts presented in evidence. In applying the UCC, the Trial Court cited as pertinent the Implied Warranties of Merchantability and Fitness of Purpose, and the evidence does not preponderate against any of the Trial Court's findings. We find no error in the Trial Court's determination to apply the UCC. We affirm the Trial Court as to this issue.

We next address whether the Trial Court erred in failing to apply the common law of contracts. It is well established that a contract can be express, implied, written, or oral, "but an enforceable contract must result from a meeting of the minds in mutual assent to terms, must be based upon sufficient consideration, must be free from fraud or undue influence, not against public policy and must be sufficiently definite to be enforced." *Klosterman Development Corp. v. Outlaw Aircraft Sales, Inc.*, 102 S.W.3d 621, 635 (Tenn. Ct. App. 2002). As stated by the Trial Court, there were no definite terms to be found from the evidence presented at trial from which to establish breach with respect to installation. Wagner posits a host of contractual theories to support his case but his inability to cite to any contractual terms vitiates his contract argument. Wagner installed the HVAC system relying on specifications provided by Novelli. The units are merchantable and fit for purpose, if not to Novelli's post-hoc satisfaction. Novelli may not now deny Wagner due payment when the evidence supports that Wagner did what Novelli asked him to do based upon the information provided by Novelli. Even if the Trial Court erred in finding that the UCC governs this transaction and we err in affirming on that basis, we find and hold that Wagner nevertheless also would prevail on the breach of contract theory advanced by Novelli as Novelli failed to present sufficient proof for either the Trial Court or this Court "to make any findings with respect to any breach of contract with respect to installation."

The final issue we address is whether the Trial Court failed to credit the testimony of Dan Clark, the witness it specifically found most credible with respect to tonnage of the HVAC units. Novelli cites Clark for his criticisms of Wagner's work. However, the Trial Court found Clark credible on the specific issue of tonnage of the HVAC units. Clark's credibility on that issue is beside the point. Clark's credibility has no bearing on the Trial Court's conclusion that Wagner installed merchantable, fit for purpose goods using information he was provided by Novelli himself. Indeed, Clark's testimony

elsewhere tends to bolster that decisive conclusion. We affirm the judgment of the Trial Court in its entirety.

## **Conclusion**

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Eric Martin Novelli, and his surety, if any.


_____
D. MICHAEL SWINEY, CHIEF JUDGE