FILED
04/12/2019
Clerk of the
Appellate Courts

# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### February 21, 2019 Session

## DAVID MIOLEN ET AL. v. DOUG SAFFLES ET AL.

**Appeal from the Circuit Court for Bradley County**
**No. V-13-894    Lawrence H. Puckett, Judge**

_____

## No. E2018-00849-COA-R3-CV

_____

Plaintiffs David Miolen and Ann Miolen, husband and wife, hired contractor Doug Saffles to install, on the backyard of the plaintiffs' property, a pool, additional water features, a bathhouse, outdoor kitchen and fireplace, and a large amount of stone pavers and stairs. Because their home was on a sloping hillside, the work involved moving a lot of earth and building two retaining walls to support the project. When the work was about 90% done, plaintiffs became dissatisfied and ordered defendant off the site. They sued him for breach of contract, negligence in failing to perform in a good and workmanlike manner, misrepresentation, and violation of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et seq.* (Supp. 2018). Defendant counterclaimed for unpaid work. The trial court held that defendant violated the TCPA by misrepresenting that both walls had been engineered by a professional engineer, and by charging plaintiffs $10,000 in "engineering" expenses that were not incurred by an engineer. The court awarded plaintiffs $68,974 in compensatory damages and assessed treble damages for the TCPA violation, plus plaintiffs' costs and attorney's fees. The total amount of $232,285.31 was offset by a judgment in defendant's favor on his counterclaim in the amount of $12,061.75. As calculated in our opinion, the net award to plaintiffs is reduced to $127,727.56. The trial court's judgment, as modified, is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed as Modified; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and JOHN W. MCCLARTY, J., joined.

Douglas M. Cox, Chattanooga, Tennessee, for the appellants, Doug Saffles, individually and dba Saffles Dozer Service, LLC.

Joshua H. Jenne, Cleveland, Tennessee, for the appellees, David Miolen and Ann Miolen.

-1-

# OPINION

## I.

On September 18, 2012, defendant submitted to the plaintiffs two "budget proposals." One was for "site work" and "retaining walls" with eight line items that totaled $104,000. The other proposal was for a "new water feature and amenities" with twelve line items totaling $115,665. The parties agreed, and the trial court found, that these two proposals formed the contractual agreement between the parties. The proposal for the retaining walls included a line item for "engineering" in the amount of $10,000. The "water feature" proposal included 2,500 square feet of stone pavers at a charge of $25,625.

Dennis N. Gore, a professional engineer and registered land surveyor, conducted a survey and developed a set of preliminary sketches for the project. The sketches are prominently marked "FOR REVIEW ONLY" and "NOT FOR CONSTRUCTION." Gore testified that the purpose of the sketches was "to give you a rough idea of how much it was going to cost." He charged $1,000 for the survey and sketches, which was paid directly by plaintiffs. This was in addition to and not included in the parties' agreement as reflected in the two budget proposals.

The sketches indicate that two retaining walls would be required. The larger of the two, the "lower wall,"[1] was further away from the house than was the "upper wall." The lower wall was estimated to be about 1,600 square feet and 14 feet high at its highest point. The top of the lower wall marks the end of the outside entertainment space in the back yard; beyond it is a downward-sloping wooded area. The roughly 900 square foot upper wall is slightly more than four feet tall at its highest point. It contains some steps to the entertainment space.

The following photographs are designed to assist the reader in understanding the facts of this case. Figure 1 is an early picture of the pool area under construction. The upper wall is shown in the top right hand corner of the photograph. The lower wall under construction is shown in the far left of Figure 1. Figure 2 shows a portion of the completed lower wall. Figure 3 shows a portion of the completed upper wall. Figure 4 is a picture of the completed outside entertainment space.

---

[1] The parties referred to the two walls as the "lower wall" and the "upper wall." We will use the parties' nomenclature.



Figure 1



Figure 2



Figure 3



Figure 4

-4-

Defendant asked Gore to prepare an estimate of how much he would charge to engineer the two walls. Gore submitted a one-page estimate captioned "Engineering/survey proposal for Dr. David Miolen." It proposes a charge of $5,000 for "retaining wall design" for the upper wall, and the same amount for the lower wall, for a total of $10,000. Significantly, defendant did not further utilize Gore's engineering services, but he did present Gore's proposal to plaintiffs and requested a $10,000 payment. Plaintiffs wrote defendant a $5,000 check on the spot, and later paid the remaining $5,000 after receiving an invoice from defendant.

Defendant hired professional engineer William Lamb to prepare plans and specifications for the lower wall. Lamb charged $1,200 for his plans. Defendant testified that in constructing the lower wall, he deviated from the plans in certain regards, substituting materials in some instances. He further stated that any changes he made resulted in either the functional equivalent of what was called for in Lamb's plans, or a better and stronger alternative. Several years after the lower wall was completed, Lamb inspected it and conducted a complete geotechnical and structural analysis. He certified that the lower wall was stable, safe, and functioning as intended.

While the project was ongoing, plaintiffs decided they wanted to significantly expand it. Regarding the additional work and materials requested, the trial court found as follows:

> The project expanded in scope at the direction of [plaintiffs], including but not limited to, the existing patio under the deck which was changed from concrete to pavers, the addition of the kitchen, the location of the fireplace, the extension of the upper retaining wall behind the kitchen and fireplace, the addition of the stairs from the pool deck to the driveway, the location of the pool equipment room, and the expansion of the pool paver deck.

There is no written agreement addressing these additional items. Both parties testified that they agreed plaintiffs would pay for the additional stone pavers at a rate of eight dollars per square foot.

Plaintiffs experienced problems with the upper wall, including erosion and drainage issues. When it rained, water would pour out of joints in the wall and pool on the paved entertainment area below. Dissatisfied with defendant's work on the upper wall, plaintiffs hired Fischer Landscaping to demolish and replace the upper wall and the stairs leading from the house to the pool area, at a cost of $40,174.

Plaintiffs were also unhappy with the material that defendant used to fill the joints between stone pavers. They thought that the joints should be filled with impermeable

polymeric sand instead of the material used. Defendant testified that the entire drainage system for the pool area depended on water being able to drain through the permeable joints, so the use of polymeric sand would not be feasible. The disagreement over the paving system became heated, and plaintiffs ordered defendant off the property when the project was mostly but not entirely complete. Defendant later submitted invoices for unpaid work and materials, which plaintiffs refused to pay.

Plaintiffs filed their complaint on December 13, 2013. Following discovery, a bench trial was held on February 14-16, 2017. Both parties testified. Plaintiffs also presented the testimony of professional engineer Thomas A. Retseck, general contractor Dwight Jenkins, and home inspector John Christopher German. Defendant presented the testimony of engineer Gore, engineer Lamb, and Daniel Kalar, an architectural distributor and contractor representative for the Pavestone Company. The trial court entered a thorough thirty-page order finding, in pertinent part, as follows:

> The Court credits the testimony of [defendant] and Kalar over that of Jenkins as to the workmanlike quality of the pavers, the pool installation, and lower wall as constructed. The Court credits [defendant] and Engineer Lamb that the lower wall is of safe and sound construction as built over the testimony of Jenkins and Retseck to the contrary.

> \* \* \*

> [Defendant] described his construction of the lower wall and his use of pavers sealed with crushed stone as an entirely complete drainage system. The Court finds that it is a properly constructed and a complete drainage system.

> \* \* \*

> Retseck did not perform any testing, analysis, or calculations with respect to the 14 foot wall. Retseck did not see any significant changes in the wall when he inspected it. Retseck did not agree with the assumptions that Lamb utilized in his calculations, but offered no explanation or evidence that any of Lamb's assumptions were inaccurate. Retseck's opinion was that, in order to make the 14 foot lower wall safe, another

7 foot wall should be built below the existing 14 foot wall to make it structurally sound.

As concerns the safety of the lower 14 foot wall, the testimony of engineer Tom Retseck[,] while he is certainly qualified[,] is not as credible as engineer Lamb's because the Court does not find his underlying assumptions born[e] out by the preponderance of all the evidence. . . . Nevertheless, because the parties contracted for an engineered lower wall that [defendant] failed to build as engineered, regardless of Lamb's later work to determine its safety as built, the Court finds that the Plaintiffs are entitled to follow the advice of Engineer Retseck. The Court concludes that the [plaintiffs] will be required to disclose to any prospective buyer of their home Engineer Retseck's opinion as to the lower wall's safety and that such a disclosure unless Retseck's remedy be followed will decrease the fair market value of Plaintiffs' real property.

\*     \*     \*

Despite [defendant's] deviations from Lamb's engineered drawing and plans and specifications, Lamb opined that there are no defects in workmanship that affect the structural integrity of the wall. The Court made this finding of fact from the bench after the proof concluded and reiterates it here. Lamb guarantees the structural integrity of the 14 foot lower wall upon which the project rests.

(Numbering and citations to record in original omitted).

Regarding the upper wall and plaintiffs' decision to have it demolished and reconstructed, the trial court found:

After [plaintiffs] directed [defendant] to leave the project, [plaintiffs] hired Fischer Landscaping to redo the upper wall and the stairs from the pool deck to the driveway . . . for a total cost of $40,174.00. [Plaintiffs] liked Fischer's design better than [defendant's] design. While, there was no evidence at trial that an engineer would have designed the wall differently than it was constructed, the Court finds that

-7-

> Exhibit 21 [Gore's $10,000 proposal] supports Plaintiffs' contention that Defendant Saffles represented to them that the approximate 4 foot tall upper wall had been engineered. Therefore, Plaintiffs were entitled to replace this upper wall as they have done at a cost to them of $40,174.00.

(Numbering and citations to record in original omitted).

Regarding the alleged TCPA violation, the trial court found in pertinent part as follows:

> Throughout the course of the project's construction, defendant represented to Plaintiffs that he billed them, as he had been charged, ten thousand dollars ($10,000.00) for engineering cost to design the two walls. This was a representation by defendant of a presently existing or past fact when made.
>
>            \*      \*      \*
>
> Defendant represented that the walls were engineered. In fact the upper wall was not engineered and the lower wall engineered by Lamb required defendant to re-consult with Engineer Lamb, as Lamb testified, at each point that defendant deviated from Lamb's engineered drawings and specifications. Defendant's misrepresentation regarding engineering services for both the upper and lower wall constituted an unfair and deceptive act or practice intended to deceive Plaintiffs as to the quality of the work he was performing and that he had performed. . . .
>
> Reiterating, the Court finds defendant's misrepresentation was willful and knowing by clear and convincing evidence. Defendant explained that he engineered the upper wall, but, the Court finds that a reasonable consumer in the position of Plaintiffs charged $5,000.00 for engineering services for each wall, would rely on those services being performed by an engineer rather than by the General Contractor. Defendant intentionally deceived the Plaintiffs. The Plaintiffs were in fact deceived. The Court finds Plaintiffs reasonably relied upon defendant's representation to their detriment and

-8-

damage . . . and that Plaintiffs were justified in tearing down the upper wall defendant built that was not engineered.

(Term "Saffles" in original replaced with "defendant" throughout; bold font in original).

The trial court found plaintiffs incurred compensatory damages in the amount of $20,000 to build a smaller wall below the lower wall per engineer Retseck's suggestion; $40,174 paid to Fischer Landscaping to demolish and rebuild the upper wall and stairs; and $8,800, the difference between what defendant charged plaintiffs for "engineering" and what he paid Lamb. The court tripled the damage award under the TCPA, resulting in a total amount of $206,992. The trial court additionally awarded plaintiffs $25,363.31 in attorney's fees and expenses, resulting in an award of $232,285.31.[2] This amount was offset by the award to defendant on his counterclaim in the amount of $12,061.75, resulting in a net award to plaintiff of $220,223.56. Defendant timely filed a notice of appeal.

## II.

Defendant raises the following issues, as quoted from his brief:

1. Did the trial court err in failing to award defendant damages for extra work?

2. Did the trial court err in awarding plaintiffs damages in the amount of $40,174 for the work performed by Fischer landscaping?

3. Did the trial court err in holding that defendant were required to have the upper retaining wall engineered?

4. Did the trial court err in awarding plaintiffs the difference in the $10,000 engineering cost [quoted and charged by defendant and] the $1200 paid to engineer, Bill Lamb?

5. Did the trial court err in awarding plaintiffs $20,000 as damages for the [lower wall] that was certified as safe by Engineer, Bill Lamb, and accepted by the court?

---

[2] The trial court's judgment states the amount to be $231,284.31. However, this amount is also stated to be the sum of the trial court's awards of $206,992 in damages and $25,363.31 in attorney's fees and expenses, which actually equals $232,285.31. We assume the $231,284.31 figure is a mathematical or typographical error. Accordingly, we believe the accurate figure is $232,285.31.

6. Did the trial court err in finding Defendant, Doug Saffles guilty of [the TCPA violation], and awarding treble damages?

Plaintiffs raise the following additional issues:

1. Did the trial court err in finding that defendant did not breach the contract and/or negligently construct the lower wall and pavestone installation?

2. Should plaintiffs be awarded their attorney's fees incurred on appeal?

## III.

In this non-jury case, our review is de novo upon the record, with a presumption of correctness as to the trial court's factual determinations, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Murfreesboro Med. Clinic, P.A. v. Udom*, 166 S.W.3d 674, 678 (Tenn. 2005). "While 'the amount of damages to be awarded in a particular case is essentially a fact question,' 'the choice of the proper measure of damages is a question of law.' " *Harper v. Dixon*, No. E2015-00411-COA-R3-CV, 2016 WL 2954311, at *3 (Tenn. Ct. App., filed May 16, 2016) (quoting *GSB Contractors, Inc. v. Hess*, 179 S.W.3d 535, 541 (Tenn. Ct. App. 2005)). Our de novo review is subject to the well-established principle that the trial court is in the best position to assess the credibility of the witnesses; accordingly, such determinations are entitled to great weight on appeal. *Columbus Med. Servs., LLC v. Thomas*, 308 S.W.3d 368, 383 (Tenn. Ct. App. 2009); *Vantage Tech., LLC v. Cross*, 17 S.W.3d 637, 644 (Tenn. Ct. App. 1999). The trial court's conclusions of law are not accorded a presumption of correctness. *Udom*, 166 S.W.3d at 678; *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996).

## IV.

## A.

We first address the damage award for the lower wall. As already stated, the trial court credited engineer Lamb's testimony and certification that the wall was safe, sound, and suitable for its intended purpose. The record includes Lamb's report, which documents his investigation and extensive calculations that support this conclusion. As regards the deviations from Lamb's specifications, defendant testified that in every instance he "over-engineered" the lower wall by using, for example, more backfilled gravel than required, and longer sections of geogrid, a stabilizing material installed between the courses of block. The trial court specifically stated that it "found credible [defendant's] testimony that he 'overbuilt' the wall." Although engineer Retseck testified

that he disagreed with Lamb's conclusion, the trial court expressly stated that it credited Lamb's testimony over Retseck's in this regard. At the time of trial, it was shown that plaintiffs had used and enjoyed the pool area for about four years, and the wall had not shifted or otherwise shown any propensity to be unsafe or unsuitable. The trial court also found that plaintiffs had expressed no dissatisfaction with the lower wall's appearance, and the evidence supports this conclusion. In short, both the evidence and the trial court's findings of fact indicate that plaintiffs got entirely what they bargained for in the lower wall. No repair was needed for the plaintiffs to have an "engineered" wall built in a good and workmanlike manner, and suitable for safely supporting the outside recreation area.

Nevertheless, the trial court ruled as follows:

> The [$20,000] damage is awarded by the Court *although the Court credits Engineer Lamb's opinion that the lower wall as built by [defendant] is structurally sound and safe*, because another engineer, Retseck has stated otherwise and the mere opinion by him in the Court's view will diminish the value of Plaintiffs' property and its ultimate resale and fair market value unless Plaintiffs follow Retseck's recommendation and build a wall below the 14 foot lower wall.

> \*     \*     \*

> The Court concludes that the [plaintiffs] will be required to disclose to any prospective buyer of their home Engineer Retseck's opinion as to the lower wall's safety and that such a disclosure unless Retseck's remedy be followed will decrease the fair market value of Plaintiffs' real property.

(Emphasis added).

Neither party argued to the trial court that a diminution in value of the property was an appropriate measure of damages in this case. No evidence was presented regarding either the property's fair market value or any diminution. The record contains no proof about what the plaintiffs might be required to disclose to a prospective buyer, should they decide to sell their property. Given that the lower wall bears the official stamp of approval of a professional engineer, the trial court's speculation about disclosure is perhaps dubious. Nevertheless, under these circumstances, this Court has held that diminution in value is an improper measure of damages. In *Buttrey v.*

-11-

*Holloway's, Inc.*, No. M2011-01335-COA-R3-CV, 2012 WL 6451802, at *9 (Tenn. Ct. App., filed Dec. 12, 2012), we stated:

> neither party produced any evidence regarding the value of the house or the impact of the defects on the value of the house. Since there was no proof as to its diminution in value, the proper measure of damages herein is the cost to repair the defects.

*Accord Harper*, 2016 WL 2954311, at *4-5. Consequently, we modify the damage award by deleting the $20,000 pertaining to the lower wall.

## B.

The trial court found that the plaintiffs contracted with defendant "for construction of a professionally engineered upper wall." The court further held that defendant breached the contract by failing to build such a wall, which caused plaintiffs to incur damages including the cost of having the upper wall demolished and rebuilt. Defendant argues that, given the wall's size and location and the other pertinent geological considerations, there was no need for a professional engineer to prepare plans and specifications for the upper wall. However, engineer Gore's survey sketches of the project, which were provided to plaintiffs at an early stage of the project, contain the notation, "reinforced earth retaining wall to be designed by qualified professional engineer."

The evidence at trial regarding whether a wall the size of the upper wall was "required" to be engineered was ambivalent. There was no evidence that defendant violated any code or ordinance by failing to hire an engineer to design it, and the trial court found no legal violation in that regard. The testimony of engineer Gore provides an example of the ambivalent proof on this issue:

> Q. Why was it, sir, that you required or recommended in your drawing there that engineering be put in place on both the upper and the lower wall?
>
> A. Because of the height.
>
> Q. Anything else?
>
> A. No.
>
> Q. What about the grade of the existing terrain?

A. Well, that's what I was talking about, the height of the wall.

*       *       *

Q. Okay. So according to your cost estimate, both the upper wall and the lower wall would require about the same amount of effort?

A. Yes.

Q. Are you aware that the upper wall was constructed without engineering design?

A. No, I am not.

Q. You weren't aware of that?

A. No.

Q. Would that cause you any concern?

A. No.

Q. It would not?

A. Not on the upper wall.

Q. Okay. So if you show us in your drawing that engineering was needed and you provided a quote showing what it would cost to provide such engineering services, you're saying it's not that big a deal if engineering wasn't used?

A. Well, it should have been used, yes.

Q. So it is a concern that it wasn't?

A. True.

Gore stated that, generally speaking, "if the wall is four feet or less, it does not require an engineering drawing." Engineer Retseck testified that "the civil engineering for walls, in

-13-

most cases at four to five feet, it becomes a retaining wall that needs to be engineered." Engineer Lamb said that "whether or not you need an engineer is entirely dependent upon the jurisdiction where the wall is being constructed," and "many jurisdictions will require an engineer if the wall is over four feet tall." Bradley County, where the wall was built, is not one of those jurisdictions. Plaintiffs' expert, general contractor Jenkins, asked if there is "a certain height associated with when a person seeks an engineer's advice versus not," answered, "yes. Most manufacturers, I think, state over eight feet." As already noted, the upper wall was just over four feet tall at its highest point.

Irrespective of whether the upper wall was "required" to be engineered, the evidence preponderates in favor of the trial court's conclusion that the parties' contractual agreement included the understanding that the upper wall was to be engineered. As noted, Gore's survey sketches expressly stated this. The contract provided for $10,000 to be paid for "engineering." Plaintiff David Miolen testified he understood that they were paying for both walls to be engineered, and further testified as follows:

> Q. Referring to Exhibit 21, what did you understand that to be
> or what's your recollection of what that was?
>
> A. This was supposedly for the two walls that were supposed
> to be drawn for us.
>
> Q. Okay. What – is it another invoice from Mr. Gore?
>
> A. Yes. This says Mr. Gore, yes.
>
> Q. And what's the date on it?
>
> A. October 8th, 2012.
>
> Q. All right. How was that invoice or purported invoice
> given or delivered to you?
>
> A. By hand.
>
> Q. From whom?
>
> A. Mr. Saffles.
>
> Q. Okay. With his delivery of that invoice, what did he ask
> for you to do?

A. Pay half of it then, five thousand dollars at that time. He would collect the other five thousand at a later date.

Exhibit 21, Gore's "engineering/survey proposal," states: "retaining wall design, lower wall ... $5,000.00" and "retaining wall design, upper wall ... $5,000.00." Defendant did not deny or contradict the above account of what happened with defendant's presentation of Exhibit 21 to plaintiff, and plaintiffs' two $5,000 payments thereafter. The trial court obviously credited plaintiff's testimony on this point. It is not disputed that no professional engineering was done on the upper wall; rather, defendant designed and built it himself. We affirm the trial court's judgment that defendant thereby breached the contract.

Plaintiff testified as follows regarding the upper wall:

> Q. What can you tell the Court about the problems that you and your wife saw with that upper wall as pictured and that has since caused you to have it demolished?
>
> A. Well, the erosion was really bad. I mean, water would be gushing down. Like, any kind of – even a small rainstorm, there would be a lot of water that would collect on the concrete. It would start pouring down in this area and start – everything was getting washed away really fast. . . . [T]he dirt behind the wall was getting washed down and other stuff was getting washed down. And it was just obviously not compacted against that.

*    *    *

> Q. When it would do that, as we see in the photograph, when water would come through the wall, would there be any residue or mud or –
>
> A. Oh, yeah.
>
> Q. – water on your deck there?
>
> A. Yeah.

The parties entered into evidence well over 100 photographs of the project in various stages of completion. Several of these depict what plaintiff described above –

rainwater pouring through the seams between blocks in the upper wall like a fountain. Defendant testified that this was a feature of his drainage system, not a defect. He said the pressure from the water was relieved from behind the wall this way, and that the runoff water would drain through the floor of the pool area between the pavestones. Plaintiff further testified that after Fischer Landscaping replaced the wall,

> Q. Since the wall has been reconstructed, did you have any similar problems with the erosion control or –
>
> A. Oh, no. No, there hasn't been any.
>
> Q. It hasn't been a problem?
>
> A. No, not at all.
>
> Q. Okay.
>
> A. The water hasn't been pouring through the walls.

The trial court, who saw and heard the witnesses live, was in the best position to evaluate the testimony on this issue. Considering the trial court's credibility determination, we decline to disturb the trial court's ruling that "[p]laintiffs were justified in tearing down the upper wall defendant built that was not engineered." Thus, the award of $40,174 reflects a proper measure of damages as a cost to repair plaintiffs' injury. The evidence does not preponderate against the trial court's decisions on this point.

## C.

Defendant argues that the trial court erred in holding that he violated the TCPA and trebling the damage award under that statute. As this Court has stated,

> The [TCPA] prohibits, among other things, "unfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code Ann. § 47–18–104(a) . . . . A "deceptive" act or practice is "one that causes or tends to cause a consumer to believe what is false or that misleads or tends to mislead a consumer as a matter of fact." *Tucker v. Sierra Builders*, 180 S.W.3d 109, 116 (Tenn. Ct. App. 2005) (citations omitted). An act or practice may be deemed unfair if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." *Id.* at 116–17 (citing 15

U.S.C. § 45(n)). Because the TCPA is remedial, courts have determined that it should be construed liberally in order to protect the consumer. *Id.* at 115. In order to recover under the TCPA, a plaintiff must prove: (1) that the defendant engaged in an unfair or deceptive act; and (2) that the defendant's conduct caused an "ascertainable loss of money or property. . ." *Id.* (quoting Tenn. Code Ann. § 47–18–109(a)(1)); *see also Cloud Nine, L.L.C. v. Whaley,* 650 F.Supp.2d 789, 798 (E.D.Tenn. 2009) ("plaintiffs asserting claims under the [TCPA] are required to show that the defendant's wrongful conduct proximately caused their injury). . . .

Whether a particular representation or act is "unfair" or "deceptive," within the meaning of the TCPA, is a question of fact, *Id.* at 116 (citation omitted), which we review *de novo* upon the record with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). Furthermore, when the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge who has had the opportunity to observe the witnesses and their manner and demeanor while testifying is in a far better position than this Court to decide those issues.

*Borla Perf. Indus., Inc. v. Universal Tool and Eng'g., Inc.,* No. E2014-00192-COA-R3-CV, 2015 WL 3381293, at *12-*13 (Tenn. Ct. App., filed May 26, 2015) (quoting *Audio Visual Artistry v. Tanzer,* 403 S.W.3d 789, 809-10 (Tenn. Ct. App. 2012)).

The deceptive act found by the trial court in this case is primarily defendant's presentation of Gore's proposal to plaintiffs and his request for $10,000 payment.[3] Plaintiff's testimony in this regard has already been quoted in Section IV(B) above.

---

[3] The trial court found that

> Gore further testified that he does not recall generating the invoice in Exhibit "21." As suggested by Plaintiffs, the Court finds that Exhibit "21" was generated by [defendant] and tendered to Plaintiffs with the intent and design by [defendant] to defraud Plaintiffs and/or to falsely justify his $10,000.00 quoted line item on Exhibit 4 relative to engineering services which were not performed by engineer Gore and not billed by him.

There is no evidence in the record to support this finding. To the contrary, Gore testified that he did remember creating and delivering to defendant the proposal entered into evidence as Exhibit 21.

-17-

Defendant was not asked many questions about his presentation of Gore's proposal; his entire testimony on this point is as follows:

> Q. There's been much said about the engineering cost in this particular case and the Dennis Gore bill. Did you ever bill ten thousand dollars for Dennis Gore?
>
> A. No, sir. No, sir.

*   *   *

> Q. I think, Mr. Gore's quote, as he called it, or invoice, was dated, like, October the 9th or somewhere in the same month. And again, not to speak for him, but I think you said that he was providing that as a cost estimate to give to you about –
>
> A. That was his proposal, yes, sir.
>
> Q. Okay – about what his engineering services would entail.
>
> A. Uh-huh.
>
> Q. What he would charge.
>
> A. Uh-huh.
>
> Q. And I think you said that that was intended for you and/or that he didn't intend to give that to the [plaintiffs].
>
> A. I may have had one that I gave to the [plaintiffs], because if they asked me for something, I'd give it to them. I wasn't trying to hide anything. That may have come from me.
>
> Q. But that – your testimony under oath is that that invoice was not intended to support your drawing.
>
> A. No. No. No, sir, that is – yeah, I see what you're saying because it's the same – yeah. No, most of that was probably already through the spreadsheet, yeah. No. No, sir, that's not – that's not Mr. Gore's proposal.

The trial court, which had the benefit of viewing the witnesses live and assessing their demeanor and credibility, held that defendant intentionally and knowingly deceived plaintiffs by misrepresenting that both walls had been engineered. Because defendant did not accept Gore's proposal to design the walls at a cost of $5,000 each, there was no legitimate reason for defendant to have presented plaintiffs with the proposal and demanded payment of $10,000.

The TCPA provides trial courts discretion in deciding whether to award multiple damages for a knowing or intentional violation. Tenn. Code Ann. § 47-18-109(a)(3); *Wilson v. Esch*, 166 S.W.3d 729, 731 (Tenn. Ct. App. 2004) ("The determination of whether such an award is appropriate under the facts of the case lies within the sound discretion of the trial court."). We review the trial court's decision under the abuse of discretion standard. *Id.; Brooks v. Tenn. Farmers Mut. Ins. Co.*, No. M2013-02326-COA-R3-CV, 2014 WL 6735129, at *9 (Tenn. Ct. App., filed Nov. 26, 2014). We find no abuse of discretion in the trial court's decision to award treble damages.

## D.

We next address the trial court's findings regarding the paving system. Defendant presented his own testimony and that of expert witness Kalar. They stated that the pavers were installed in a good and workmanlike manner, and functioned as intended. General contractor Jenkins testified that the pavers had settled more than he would have expected, and that led him to question whether the substrate beneath them was properly installed. All of the experts were in general agreement that in a project of this size, a certain number of pavers are expected to come loose or settle more than expected. Fixing these few problem pavers was described as a "punch list" item, one that defendant would have returned to easily repair as needed. In this case, plaintiffs did not allow defendant to finish the project, so he had no opportunity to fix punch list items. The trial court evaluated the testimony as follows:

> Kalar visited the project on at least two occasions and observed how the pavers were being installed and the materials being used. The Court credits his professional opinion that the pavers were installed in a workmanlike manner using proper materials.

> \* \* \*

> The Court finds that the pavers were installed in a workmanlike manner and that the pavers and crushed stone were proper materials to install under the parties' agreement.

-19-

> According to Kalar, the pavers were not defectively installed.
> . . . As to the workmanlike quality of [defendant's] paving,
> the Court credits Kalar's testimony over that of General
> Contractor Dwight Jenkins.

Plaintiffs argue that the trial court erred in finding no defect in the paving system. We have reviewed all of the evidence pertaining to the installation of pavers, again bearing in mind the trial court's prerogative to assess credibility, and find that it does not preponderate against the trial court's ruling.

It is undisputed that plaintiffs asked defendant to significantly expand the scope of the project midway through. Among other things, the expansion required many more pavers than originally quoted and contracted for. As already noted, the agreement estimated 2,500 square feet of pavers at a price of $25,625. The parties further agreed that plaintiffs would pay eight dollars per square foot for additional pavers in the expanded paved area. On appeal, defendant argues that the trial court erred in failing to award him the costs of installing the additional pavers that he performed but was not paid for.

At trial, plaintiffs' own expert Jenkins testified that 6,562 square feet of pavers were installed in the project. The trial court expressly credited this testimony and made a finding in accordance, stating:

> Jenkins contacted a subcontractor in Atlanta to give him an
> estimate for removing the crushed stone and replacing it with
> polymeric sand. The subcontractor visited the Miolen project
> and measured the square footage of pavers installed. He
> measured 6,562 square feet of pavers and estimated
> $27,709.00 to replace the crushed stone with polymeric sand.

> \*     \*     \*

> There are three and a half pavers in every square foot of
> pavers installed. Therefore it would take 22,967 pavers to
> constitute 6,562 square feet of pavers in the Miolen project.
> (3.5 x 6,562 = 22,967)

> There were very few pavers that were not level *out of the
> 22,967 installed.*

(Emphasis added; numbering and citation to record in original omitted).

The trial court awarded defendant $12,061.75 for unpaid work done on the outdoor kitchen and the additional water features and amenities. It awarded him nothing for the additional pavers installed, stating only that "all other claims of Saffles as counter-plaintiff have not been sustained by the preponderance of the evidence." Plaintiffs argue in their brief that this ruling is sustainable by the application of the concept that "the party that first materially breached a contract is not entitled to damages stemming from the other party's later material breach of the same contract." *Forrest Constr. Co. v. Laughlin*, 337 S.W.3d 211, 226 (Tenn. Ct. App. 2009) (internal quotation marks omitted). We disagree. First, this statement from the *Forrest* opinion is dicta, because the Court there held that "it was Forrest Construction that was the first and only party to materially breach the contract." *Id.* Second, *Forrest* also contains the following pertinent principle:

> Despite Forrest Construction's breach, it would be entitled to recover the reasonable actual costs of the work that went into the Laughlins' home. *See Rodgers v. Walker*, No. 03A01-9708-CH-00371, 1998 WL 670381 (Tenn. Ct. App. Sept. 30, 1998). This is because while the Laughlins are entitled to damages that would put them in the position they would have been in had Forrest Construction not breached, they are not entitled to profit from that breach. *Id.* at *4 (citing *Hennessee v. Wood Group Enterprises, Inc.*, 816 S.W.2d 35 (Tenn. Ct. App. 1991)).

*Id.* at 226-27. Third, if plaintiffs' position is correct that defendant is not entitled to recover for work performed as agreed but not paid for because he first materially breached the contract, then they logically would have appealed the trial court's judgment *in any amount* on the counterclaim, which they did not. We hold that the evidence and the trial court's own findings of fact preponderate in favor of increasing the award on the counterclaim by $32,496, reflecting 4,062 additional square feet at the agreed-upon rate of eight dollars per square foot. Exercising our discretion, we decline plaintiffs' request for attorney's fees on appeal and hold each party responsible for their own attorney's fees.

## V.

Lest there be any dispute as to the damages awarded in this case, we take this opportunity to state the awards made by the trial court and, as modified, by us.

As stated by the trial court, its award to the plaintiffs contains the following elements:[4]

| | |
|---|---|
| Lower wall damages ($20,000) as trebled | $60,000 |
| Engineering charge misrepresented by defendant ($8,800) as trebled | 26,400 |
| Upper wall damages ($40,174) as trebled | 120,522 |
| Attorney's fee and costs | 25,363 |
| TOTAL | $232,285 |

On the defendant's counterclaim, the trial court awarded him: $12,062

We increased defendant's award for pavers installed by defendant but not paid for: 32,496

TOTAL $44,558

We vacated the $60,000 award, as trebled, regarding the lower wall damages. Thus, the trial court's award is reduced to $172,285. When the awards to defendant are taken into account, the final net award to plaintiffs is $127,727.

---

[4] Cents ignored.

## VI.

The trial court's judgment, as modified by us, is hereby affirmed. This case is remanded to the trial court for enforcement of its decree, as modified, and for collection of costs assessed by the trial court.

_____
CHARLES D. SUSANO, JR., JUDGE